## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **K.W., F.E., B.J., T.M., M.G., and I.B.,** | : Civil Action No.: 4:13-CV-3051 |
| **Individually, and as Class Representatives,** | : |
| **Plaintiff,** | : |
| | : District Judge: Matthew W. Brann |
| **v.** | : |
| | : |
| **JULIE A. HOLTZAPPLE,** | : **COMPLAINT--CLASS ACTION** |
| **JAMES R. MIDDLETON,** | : **CIVIL ACTION -- LAW** |
| **MICHAEL C. GRIFFITHS,** | : **JURY TRIAL DEMANDED** |
| **DEGG H. STARK,** | : |
| **SUSAN L. LANTZ,** | : |
| **JASON D. FRIEDBERG** | : |
| **LEWIS A. MARRARA, II,** | : |
| **AMY A. BADAL,** | : |
| **WAYNE A. BROMFIELD,** | : |
| **MICHAEL A. SMYER,** | : |
| **JOHN C. BRAVMAN,** | : |
| **ERNEST R. RITTER, III,** | : |
| **JEFFREY A. TICE,** | : |
| **JUSTIN M. ROSBOSCHIL,** | : (Electronically Filed) |
| **RYAN E. KING,** | : |
| **BUCKNELL UNIVERSITY,** | : |
| **UNION COUNTY, PENNSYLVANIA,** | : |
| **MONTOUR COUNTY, PENNSYLVANIA,** | : |
| **Defendants.** | : |

### AMENDED COMPLAINT

    **AND NOW** come the Plaintiffs, K.W., F.E., B.J., T.M., M.G., and I.B., by

and through their undersigned counsel, Devon M. Jacob, Esquire, and the law firm

of Jacob Litigation, and avers as follows:

**Jurisdiction and Venue**

1.      This action is brought pursuant to 42 U.S.C. § 1983.

2.      Jurisdiction is founded upon 28 U.S.C. § § 1331, 1332, 1343, and 1367.

3.      Venue is proper in this Court, as the cause of action arose in the Middle District of Pennsylvania.

**Use of Fictitious Names**

4.      It is respectfully requested that the Court grant the Plaintiffs leave of court to proceed with their action using only their initials, because denying their request to do so would (1) cause the Plaintiffs to suffer the very injury that their lawsuit seeks to prevent, and (2) undermine the public's interest in having the claims litigated to completion.

5.      "Whether to allow a plaintiff to proceed anonymously is within the discretion of the trial court." See Doe v. United States, 2007 U.S. Dist. LEXIS 42173 *3 (W.D.Pa. 2007); see also Doe v. Evans, 202 F.R.D. 173 (E.D.Pa. 2001). As the Court stated in Doe v. Provident Life & Accident Ins. Co.,

> [t]his Court finds that a party to a civil action--either defendant or plaintiff--may use a pseudonym when the circumstances of the case justify such use. Indeed, the overwhelming majority of jurisdictions to consider this question have determined that parties may proceed in pseudonym under particular circumstances. See, e.g., Coe v. United States Dist. Court for Dist. Colo., 676 F.2d 411, 414 (10th Cir. 1982). Federal courts have long approved the practice of pseudonymous litigation. The most famous example of pseudonymous litigation is Roe v. Wade, 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973). In Roe, this Court finds the Supreme Court's implicit recognition of this

2

practice. Further, nothing in the Rules or the Advisory Committee Notes to the Rules indicates that the drafters were attempting to promulgate a rule that neither a civil defendant nor civil plaintiff ever could proceed in pseudonym. Therefore, this Court concludes that a party to a civil action--whether defendant or plaintiff--may proceed in pseudonym when the particular circumstances of the case justify such pseudonymity.

Doe v. Provident Life & Accident Ins. Co., 176 F.R.D. 464, 466 (E.D.Pa. 1997).

6.    Federal courts at all levels have recognized that courts have the discretion to permit a party to proceed under a fictitious name where the party in question has a privacy right that outweighs the "presumption of openness in judicial proceedings." Doe v. Frank, 951 F.2d 320, 323 (11th Cir. 1992) (quoting Doe v. Stegall, 653 F.2d 180, 186 (5th Cir. 1981)); see, e.g., James v. Jacobson, 6 F.3d 233, 238-39 (4th Cir. 1993); Coe v. United States Dist. Ct. for the Dist. of Colo., 676 F.2d 411, 418 (10th Cir. 1982); Southern Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe, 599 F.2d 707, 713 (5th Cir. 1979); Doe v. Shakur, 164 F.R.D. 359, 360 (S.D.N.Y. 1996); Doe v. Bell Atlantic Business Sys. Servs., Inc., 162 F.R.D. 418, 420 (D. Mass. 1995).

7.    Not only has the U.S. Supreme Court not precluded the use of fictitious names, it has permitted their use. See, e.g., Roe v. Wade, 410 U.S. 113 (1973); Doe v. Bolton, 410 U.S. 179 (1973).

8.    Courts have permitted use of fictitious names where use of the Plaintiff's true name would result in precisely the harm the lawsuit seeks to prevent. See, e.g., Roe v. Ingraham, 364 F. Supp. 536, 541 n.7 (S.D.N.Y. 1973) (privacy

challenge to statute requiring disclosure of identities of patients receiving certain prescription drugs).

9.      Courts have identified factors to consider in determining whether a Plaintiff's interest outweighs the presumption favoring public identification of litigants.

10.     For example, in Doe v. Shakur, the court identified the following factors:

> (1) whether the plaintiff is challenging governmental activity; (2) whether the plaintiff would be required to disclose information of the utmost intimacy; (3) whether the plaintiff would be compelled to admit his or her intention to engage in illegal conduct, thereby risking criminal prosecution; (4) whether the plaintiff would risk suffering injury if identified; and (5) whether the party defending against a suit brought under a pseudonym would be prejudiced.

164 F.R.D. 359, 361 (S.D.N.Y. 1996).

11.     Other factors may include whether the interests of children are at stake, e.g., Doe v. Stegall, 653 F.2d 180, 186 (5th Cir. 1981), and whether there are less drastic means of protecting legitimate interests of either the party seeking anonymity or the opposing party, see James v. Jacobson, 6 F.3d 233, 241 (4th Cir. 1993).

12.     In the instant matter, the Plaintiffs allege that the Defendants conducted an unlawful search of their residences and that several of the Plaintiffs were unlawfully subjected to university disciplinary proceedings, and identified in their student file as having been associated with a drug incident at the university.

4

13.     If the Plaintiffs are identified by the general public, the mere fact of arrest, and certainly any documented internal disciplinary findings, will seriously damage the students' standing with fellow students and teachers, as well as interfere with current or future opportunities for higher education and employment.

14.     Importantly, the Defendants already possess student records that contain the full names of the Plaintiffs and prospective Plaintiffs' class members.

15.     Moreover, the Plaintiffs are willing to provide their full names to all of the Defendants and the Court under seal.

16.     The public has a great interest in determining whether or not the Fourth Amendment governs the conduct of private and publicly funded law enforcement personnel when they work as a team to search private student housing for drugs, drug paraphernalia, and other items that might violate state law, federal law, or just the private university's policies.

17.     The general public, however, has absolutely no interest in learning the identities of the six student Plaintiffs who are attempting to represent the entire class of persons who were injured.

18.     Since the Defendants and Court will be provided upon request with the Plaintiffs' identities, the Defendants cannot establish *any* prejudice resulting from the Plaintiffs' identities being withheld from the general public and/or the Plaintiffs' current or future employers.

19.    If the Plaintiffs are required to proceed using their full names on the public docket, they will suffer the injury that they are seeking to prevent, and when they prevail, the Court will be unable to remedy their injury through equitable and/or injunctive relief.

20.    Furthermore, if the Plaintiffs are required to publicly disclose their identities, they will be less inclined to proceed with the litigation, thereby undermining the public's strong interest in having the claims fully litigated.

## PARTIES[1]

21.    Plaintiff, K.W., is an adult individual who during the relevant period of time, resided at 64 University Avenue, Lewisburg, PA 17837.  K.W. currently resides in Lewisburg, PA.

22.    Plaintiff, F.E., is an adult individual who during the relevant period of time, resided at 64 University Avenue, Lewisburg, PA 17837.  F.E. currently resides in New York, NY.

23.    Plaintiff, B.J., is an adult individual who during the relevant period of time, resided at 64 University Avenue, Lewisburg, PA 17837.  B.J. currently resides New York, NY.

---

[1] Prior to the filing of the instant matter, in an effort to ensure that only proper persons and entities were named as Defendants, undersigned counsel asked Bucknell to produce at least a redacted copy of the police report in question and even offered to enter into a confidentiality agreement related to same.  Bucknell refused to do so.

24.    Plaintiff, T.M., is an adult individual who during the relevant period of time, resided at 64 University Avenue, Lewisburg, PA 17837.  T.M. currently resides in Lewisburg, PA.

25.    Plaintiff, M.G., is an adult individual who during the relevant period of time, resided at 64 University Avenue, Lewisburg, PA 17837.  M.G. currently resides in Milton, PA.

26.    Plaintiff, I.B., is an adult individual who during the relevant period of time, resided at 23 University Avenue, Lewisburg, PA 17837.  M.G. currently resides in Lewisburg, PA.

27.    Defendant, Julie A. Holtzapple, is an adult individual, who during all relevant times was employed by Bucknell University, as a Public Safety Officer. Holtzapple acted under color of state law and is sued in her personal capacity.

28.    Defendant, James R. Middleton, is an adult individual, who during all relevant times was employed by Bucknell University, as a Public Safety Officer. Middleton acted under color of state law and is sued in his personal capacity.

29.    Defendant, Michael C. Griffiths, is an adult individual, who during all relevant times was employed by Bucknell University, as a Public Safety Officer. Griffiths acted under color of state law and is sued in his personal capacity.

30.    Defendant, Degg H. Stark, is an adult individual, who during all relevant times was employed by Bucknell University, as a Public Safety Officer. Stark acted under color of state law and is sued in his personal capacity.

31.    Defendant, Jason D. Friedberg, is an adult individual, who during all relevant times was employed by Bucknell University, as the Chief of Police. Friedberg acted under color of state law and is sued in his personal capacity.

32.    Defendant, Susan L. Lantz, is an adult individual, who during all relevant times was employed by Bucknell University, as a Dean of Students.  "The Dean of Students supervises and coordinates nearly all student service and student life programs and functions, including Campus Activities and Programs, Student Health, Psychological Services, Fraternity and Sorority Affairs, Diversity Offices, and the Office of Religious Life." (2013 Bucknell Student Handbook[2] (hereinafter "Handbook," a copy of which is attached at **Exhibit 1**) at 8).  Lantz acted under color of state law and is sued in her personal capacity.

33.    Defendant, Lewis A. Marrara, II, is an adult individual, who during all relevant times was employed by Bucknell University, as a Dean of Students.  "Dean Marrara is the administrator of the student conduct system and oversees all student conduct policies, facilitate[s] conversations regarding community expectations and

---

[2] Prior to the filing of the instant matter, in an effort to conserve litigation resources for all involved litigants, undersigned counsel asked Bucknell to produce the version of the Bucknell Student Handbook that was in effect on during the relevant period of time.  Bucknell refused to do so.

he is responsible for student conduct administration, including the Community Conduct Board (CCB). He serves as department liaison to the Department of Public Safety and is the initial contact for parents calling on behalf of a student's behavior." (Handbook at 9). Marrara acted under color of state law and is sued in his personal capacity.

34.    Defendant, Amy A. Badal, is an adult individual, who during all relevant times was employed by Bucknell University, as an Assistant Dean of Students.  "Among other activities, Dean Badal is responsible for Residential Education, New Student Orientation, Fraternity and Sorority Affairs and Student Leadership Programs." (Handbook at 11). Badal acted under color of state law and is sued in her personal capacity.

35.    Defendant, Wayne A. Bromfield, is an adult individual, who during all relevant times was employed by Bucknell University, as General Counsel.  "The President is also advised by the general counsel who is a member of the President's Senior Staff." (Handbook at 7).  The General Counsel "is responsible for its legal affairs and contracts, risk management and insurance, and compliance with federal and state laws." (www.bucknell.edu). Bromfield acted under color of state law and is sued in his personal capacity.

36.    Defendant, Michael A. Smyer, is an adult individual, who during all relevant times was employed by Bucknell University, as the Provost.  "The Provost

9

is also responsible for student affairs issues, including residential life, Residential Colleges, Fraternity and Sorority Affairs, Bucknell Student Health, and Religious Life." (Handbook at 7). Smyer acted under color of state law and is sued in his personal capacity.

37.   Defendant, John C. Bravman, is an adult individual, who during all relevant times was employed by Bucknell University, as the President. "In principle, the Board of Trustees . . . including Bucknell's President, is legally responsible for the direction of the University . . . the Board delegates authority for the management of the University to the President and to the faculty." (Handbook at 6). "The President of the University is the chief executive officer and a voting member of the Board of Trustees, responsible for the management and governance of the University, including carrying out and interpreting the policies of the Board." (Id.). Bravman acted under color of state law and is sued in his personal capacity.

38.   Defendant, Ernest R. Ritter, III, is an adult individual, who during all relevant times was employed by Union County, Pennsylvania, as a Sheriff. Ritter acted under color of state law and is sued in his personal capacity.

39.   Defendant, Jeffrey A. Tice, is an adult individual, who during all relevant times was employed by Union County, Pennsylvania, as a Deputy Sheriff. Tice acted under color of state law and is sued in his personal capacity.

40.    Defendant, Justin M. Rosboschill, is an adult individual, who during all relevant times was employed by Union County, Pennsylvania, as a Deputy Sheriff. Rosboschill acted under color of state law and is sued in his personal capacity.

41.    Defendant, Ryan E. King, is an adult individual, who during all relevant times was employed by Montour County, Pennsylvania, as a Deputy Sheriff.  King acted under color of state law and is sued in his personal capacity.

42.    Defendant, Bucknell University, 1 Dent Drive, Lewisburg, Pa. 17837, is a private liberal arts university, which employs one or more Defendants. Bucknell acted under color of state law. Bucknell has agreed by contract and is required by law, "To protect the privacy of students. Students shall not be subjected to unreasonable searches or seizures of their personal property." (Handbook at 3).

43.    Defendant, Union County, Pennsylvania, owns and operates the Union County Sheriff's Office, which employs one or more Defendants.  The address for Union County is Union County Government Center, 155 North 15th Street, Lewisburg, Pa. 17837. Union County acted under color of state law.

44.    Defendant, Montour County, Pennsylvania, owns and operates the Montour County Sheriff's Office, which employs one or more Defendants.  The address for Montour County is Montour County Courthouse, 29 Mill Street, Danville, Pa. 17821. Montour County acted under color of state law.

## STATEMENT OF FACTS

### State Action

45.    A private non-state party engages in state action when (1) the private entity exercises powers that are traditionally the exclusive prerogative of the state, see Mark v. Borough of Hatboro, 51 F.3d 1137, 1142 (3d Cir. 1995), (2) the private entity has acted in concert or with the help of state officials, see id., (3) "the State has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity[,]" see id., or (4) there is a prearranged plan by which police officers substitute "the judgment of private parties for their own official authority." Cruz v. Donnelly, 727 F.2d 79, 80 (3d Cir. 1984); see also Kach v. Hose, 589 F.3d 626, 646 (3d Cir. 2009).

46.    Bucknell University Public Safety (hereinafter "BUPS") officers are sworn police officers (pursuant to PA Act 53) with powers derived from 22 Pa. Cons. Stat. § 501[3]. (Handbook at 61).

47.    BUPS officers have the same powers of arrest as any other certified municipal police officer in the Commonwealth of Pennsylvania.  (Handbook at 61).

48.    The jurisdiction of the BUPS officers is limited to Bucknell University-owned or managed properties and the immediately adjacent streets and highways.

---

[3]22 Pa. Cons. Stat. § 501 permits non-profit corporations to appoint their employees to exercise police powers "in and upon, and in the immediate and adjacent vicinity of" their property.

(Handbook at 61).

49.    The Third Circuit has held that "the delegation of police powers, a government function, to the campus police buttresses the conclusion that the campus police act under color of state authority." Henderson v. Fisher, 631 F.2d 1115, 1118 (3d Cir. 1980); see also Dempsey v. Bucknell Univ., 2012 U.S. Dist. LEXIS 62043 (M.D.Pa. 2012).

50.    The law enforcement actions discussed herein were preplanned by the Defendants collectively.

51.    Individual Defendants who were not sworn police officers acted in concert with Individual Defendants who were sworn police officers to plan, authorize, and execute, the law enforcement actions discussed herein.

## Bucknell's Drug and Alcohol Policies

52.    It is believed and therefore averred that the Drug-Free Schools and Communities Act ("DFSCA"), and other similar type federal laws, require as a condition of receiving funds or any other form of financial assistance under any federal program that an institution of higher education certify that it has adopted and implemented a drug prevention program.

53.    A failure to comply could result in the loss of federal funding, which would include but not be limited to funds provided by any federal agency, including individual students' federal grants.

13

54.    It is believed and therefore averred that Federal regulations that implement the DFSCA require universities, in part, to implement written drug and alcohol policies.

55.    It is believed and therefore averred that it is generally understood that to comply with the DFSCA and other similar type laws, at a minimum, university drug and alcohol policies must notify students and employees of the following:

a. Standards of conduct that clearly prohibit the unlawful possession, use, or distribution of illicit drugs and alcohol on school property or as part of any school activities;

b. A description of the applicable legal sanctions under local, state, or federal law for the unlawful possession or distribution of illicit drugs and alcohol;

c. A description of the health risks associated with the use of illicit drugs and the abuse of alcohol;

d. A description of any drug or alcohol counseling, treatment, or rehabilitation or re-entry programs that are available to employees or students;

e. A clear statement that the institution will impose sanctions on students and employees (consistent with local, state, and federal law), and a description of those sanctions, up to and including expulsion or termination of employment and referral for prosecution, for violations of the standards of conduct.

56.    It is believed and therefore averred that Defendant Bucknell adopted and enforced drug and alcohol policies that provided for sanctions that were not consistent with local, state, and federal law.  Specifically,

a. The drug and alcohol policies permitted university sanctions to be

substituted *in place of*, instead of, *in addition to or consistent with*, the sanctions required by local, state, and federal law.

b. Enforcement of the drug and alcohol policies resulted in local law enforcement agencies that are *funded by public monies* to be used on private university property to conduct investigations that resulted in sanctions being meted out through the private university disciplinary system instead of through the Pennsylvania Unified Judicial System or the Federal court system.

c. Enforcement of the drug and alcohol policies resulted in the diversion of local, state, and federal funds to Defendant Bucknell, a private university, through the collection of private university fines.

d. In this regard, Defendant Bucknell's Handbook provides in relevant part, that "The individual or organization may be subject to a financial penalty for engaging in inappropriate behavior. <u>The money collected from a fine will be used for the enhancement of student life on the campus.</u> (Handbook at 109) (emphasis added).

e. Selective enforcement of the drug and alcohol policies permitted the university to give the appearance of engaging in drug and alcohol enforcement, while maintaining a campus environment attractive to college age individuals, i.e., underage drinking continues at registered parties staffed by agents of Defendant Bucknell, and any imposed disciplinary sanctions are more lax than local, state, and federal law.

## Bucknell Student Handbook

57. Defendant Bucknell never invited the Plaintiffs, or any member of the prospective Plaintiff's class, to negotiate any of the terms of any of the contacts that Defendant Bucknell required to be signed.

58. Rather, the contracts were a 'take it or leave it' proposition.

59. Likewise, Defendant Bucknell never invited the Plaintiffs, or any member of the prospective Plaintiff's class, to negotiate any of the terms of the

Bucknell Student Handbook.

60.    Again, the Handbook was a 'take it or leave it' proposition.

61.    At no time did any of the Defendants ever explain to the Plaintiffs, or to any member of the prospective Plaintiff's class, that the contractual relationship included a complete or partial waiver of their Fourth Amendment rights.

62.    Likewise, none of the Plaintiffs, or any other member of the prospective Plaintiff's class, ever expressly waived, in whole or in part, their Fourth Amendment rights.

63.    It is believed and therefore averred that the Bucknell Student Handbook in effect during the relevant period of time provided in relevant part the following:

a.    **Residency Requirement:** "Bucknell requires all undergraduate students to live on campus in a University-owned facility or University-related fraternity house unless they receive formal approval to reside off campus or commute from home (with a parent or guardian in residence with him/her, a non-traditional-age student may live in his/her home or privately owned rental unit)." (Handbook at 163).

b.    **Local Law Enforcement:** "campus residential facilities are the same as any private facility and cannot be entered by police without the occupant's permission or legal search warrant." (Handbook at 11).

c.    **Drugs and Alcohol:** "a private room may be opened by an RA or member of the University staff if there is <u>reasonable cause</u> to suspect <u>violation of the law</u> or Student Code of Conduct is occurring." (Handbook at 11) (emphasis added).

d.    **Residential Living:** "The University reserves the right to enter your room in an emergency <u>or if there is reasonable cause</u> to conclude that violation of University policy, <u>or state or federal law</u> is occurring." (Handbook at 17) (emphasis added).

16

e. **Public Safety Officers:** "Public Safety officers may enter your room any time they believe a crime or violation has been, is about to be, or is being committed. In most circumstances the officer will knock and announce that "Bucknell Public Safety" is requesting entry. However, [sic] exigent circumstances dictate both internally and externally that an officer can key into your room without waiting to be granted access. This includes failure to answer your door when someone is believed to be inside, at which time officers are required to enter to check on the person's well-being." (Handbook at 19) (emphasis added).

f. **Public Safety Officers:** "If you are not in your room, a Public Safety officer will enter the room, usually with another officer or RA, to witness the room entry." (Handbook at 19).

g. **Public Safety Officers:** "Room searches are conducted if there is reasonable suspicion to believe a crime or violation has been, is about to be, or is being committed." (Handbook at 19) (emphasis added).

h. **Public Safety Officers:** "A search following a crime committed in a room in plain sight of an officer can only involve the areas of plain sight. Public Safety officers may not search any closed areas (such as drawers, closets, or bags) without permission of the student, permission from the Dean of Students, and/or a search warrant." (Handbook at 19) (emphasis added).

i. **Public Safety Officers:** "Illegally possessed alcohol, drugs, firearms, and fireworks can be confiscated from dorm rooms and destroyed. Discovery of such items may result in internal and/or external charges being filed." (Handbook at 19) (emphasis added).

j. **Room Search:** "In the event of an emergency, or if there is reasonable cause to believe that a violation of University policy or state or federal law is occurring or has occurred or exigent circumstances exist, Bucknell reserves the right, exercised through Department of Public Safety officers or other duly authorized University officials, to enter any University-owned or University-supervised residence unit, room or area to conduct a "plain view search" of the room or space, including the refrigerator, or to take appropriate action in response to an emergency whether or not the occupant(s) is present. A full search of a

residence unit, room or area <u>may be authorized by the Dean of Students or his/her designee when there is a reason to believe</u> that there is contraband <u>or ongoing illegal activity</u> or a violation of University regulations, policy or procedures in that unit, room or area, or there exists a danger to the building or the safety of its occupants." (Handbook at 165) (emphasis added).

k. **Room Inspections:** "Periodic inspections are made by members of the Facilities or Housing Services or Residential Education staffs to determine the need for repairs, redecorating or to evaluate the general condition, safety, and maintenance of the room. Unless otherwise specified in the residence hall contract, notifications of such inspections must be given 24 hours in advance." (Handbook at 164).

l. **Fire Safety:** "It is both a criminal and University offense to tamper with a fire alarm or smoke detector without cause or to damage or unnecessarily discharge a fire extinguisher." (Handbook at 23).

m. **Confidentiality:** "The respondent and the aggrieved party generally have the right to be assured that his/her involvement in a Student Code of Conduct violation or identity will not be disclosed by the University, except as required by law, to anyone other than those involved in the University conduct process unless prior notification is given by both students. There are three possible exceptions: 1) if a second or serious alcohol transgression or four (4) alcohol points are involved, parents/guardians can be notified; 2) if illegal drugs are involved, both parents/guardians and legal authorities can be informed; and 3) if a party directly or indirectly involved in the case misrepresents what happened in the hearing process or outcome, the University reserves the right to provide publicly a truthful account of the situation." (Handbook at 102).

n. **Family Educational Rights and Privacy Act of 1974, as amended:** "Bucknell communicates with the student directly and releases information about a student to others, including parents, only with the student's consent." (Handbook at 162).

o. **Family Educational Rights and Privacy Act of 1974, as amended:** "The release by University personnel of other information, including communications to parents from academic deans, individual faculty

members, the student's faculty adviser, and staff members of the Office
of the Deans of Students, requires the consent of the student prior to
each release." (Handbook at 162).

p. **Family Educational Rights and Privacy Act of 1974, as amended:**
"When the University believes it appropriate in its sole discretion, the
University will release to a student's parent or legal guardian
information regarding that student's violation of any federal, state or
local law or any rule or policy of the University governing the use or
possession of alcohol or a controlled substance if (a) the student is
under the age of 21 and (b) the University determines that the student
has committed a disciplinary violation with respect to that use or
possession." (Handbook at 162).

q. **Student Files:** "Student files are maintained in the Dean of Students'
Office from the time of a student's first enrollment until five (5) years
after graduation or departure from the University. Included in these
records are behavioral incidents; student work history; appointments to
committees, boards, task forces, etc.; honors; the Summary Data Form
the student completes during senior year; and other materials. It is on
the basis of these records that the Deans of Students complete various
kinds of recommendations and references. Information is not generally
released to third parties without the student's permission. There are two
main areas of exception: parents will be notified when a student is
involved in an initial alcohol violation that is relatively serious or any
second alcohol infraction; and information is shared with legal
authorities upon receipt of a court order. Students should understand
that infractions contained in a student's record may be reported without
interpretation." (Handbook at 168).

r. **Maintenance of Records:** "Records of conduct proceedings are
maintained in the individual student's file normally for a period of nine
(9) years – four (4) active undergraduate years plus five (5) additional
years [or five (5) years following the date of last attendance]."
(Handbook at 107).

s. **Maintenance of Records:** "Records maintained by the Department of
Public Safety may be maintained indefinitely and will be discoverable
if a check of records is conducted." (Handbook at 107).

19

64.     Notably, Union County and Montour County are not parties to any contract between Bucknell and its students, or mentioned in the Handbook.

65.     Moreover, the Handbook does not purport to authorize Union County or Montour County law enforcement personnel to enter student housing under any circumstances.

66.     Likewise, the Handbook does not purport to authorize a canine to search any student housing.

**February 16, 2012: 23 & 64 University Avenue, Lewisburg, PA 17837**

67.     In or around February of 2012, the Defendants planned and authorized unlawful searches to be conducted at Kappa Sigma Alpha Phi, 64 University Avenue, Lewisburg, PA 17837, and 23 University Avenue, Lewisburg, PA 17837.

68.     On February 16, 2012, it is believed that Defendants Holtzapple, Middleton, Griffiths, Stark, Ritter, Tice, Rosbochil, and King, and likely the remaining Defendants, personally conducted the unlawful searches.

69.     The aforementioned Defendants arrived at 23 University Avenue and 64 University Avenue, with law enforcement personnel in full uniform, and with two canines, Heidi and Cash, that had previously received specialized training and certification in narcotics detection.

70.     Heidi and Cash were owned by Defendants Montour County and Union County and participated in the search with the approval and consent of said

Defendants.

71.    The Individual Defendants who were employed by the Defendant Counties were employed in the capacity of deputy sheriffs or sheriff.

72.    Pursuant to longstanding Pennsylvania law, sheriffs "are not police officers – nor are they invested with general police powers beyond the authority to arrest for in-presence breaches of the peace and felonies – in the absence of express legislative designation." Commonwealth v. Marconi, 64 A.3d 1036, 1044 (Pa. 2013), as amended, January 28, 2013.

73.    At the time, Plaintiff's class members resided in the two buildings.

74.    The two buildings were private residences that had common areas shared by the Plaintiff's class members.

75.    The Plaintiff's class members had private residences that could be accessed from the common areas.

76.    The private residences could be locked by the Plaintiff's class members and were often locked.

77.    Neither the general public nor other occupants of the identified buildings had unfettered access to each private residence.

78.    The private residences generally contained that which could be usually and expected to be found in a private residence, including but not limited to personal and private papers, private photographs, clothing including undergarments, bedding,

21

medications, and toiletries.

79.    Despite the lack of a fire emergency, one or more of the Individual Defendants set off the fire alarms in both buildings.

80.    Upon hearing the fire alarms and believing that a fire emergency existed, the Plaintiffs' class members immediately exited the buildings; many without wallets, shoes, or coats.

81.    Plaintiff T.M. exited into the February air wearing just a pair of boxer shorts.

82.    Once the Plaintiffs' class members exited the buildings, the Defendants seized physical control of the buildings from the Plaintiff's class members by using the C-CURE Access Control System to lock the doors, so that the Plaintiffs' class members could not reenter the buildings.

83.    The Defendants further directed the Plaintiff's class members not to reenter the buildings until further notice.

84.    Prior to seizing and entering the buildings, and subsequently each of the Plaintiff's class members' private residences, the Defendants did not have a valid arrest or search warrant that permitted them to lawfully enter.

85.    Prior to seizing and entering the buildings, and subsequently each of the Plaintiff's class members' private residences, the Defendants did not possess probable cause that a crime was being committed <u>and</u> exigent circumstances that

necessitated an immediate entry.

86.    Prior to seizing and entering the buildings, and subsequently each of the Plaintiff's class members' private residences, the Plaintiff's class members did not provide the Defendants with valid voluntary consent to do so.

87.    Once unlawfully inside the buildings, the Defendants used Heidi and Cash, and their eyes and hands, to search for drugs or other items that might violate the universities policies and/or local, state, and/or federal law.

88.    The Defendants left the common areas of the buildings and opened the closed doors to the private residences that belonged to the Plaintiffs' class members.

89.    It is believed and therefore averred that the Defendants searched all areas inside numerous private residences that belonged to the Plaintiffs' class members.

90.    These areas included private drawers, under beds, inside clothing pockets and book bags, and other closed spaces/compartments that would not otherwise have been visible to them absent the manipulation and opening of the item by the respective Defendant.

91.    Each building was seized and searched by the Defendants for approximately three hours.

92.    Despite the extensive unlawful search of the private residences of approximately 60 persons that involved numerous law enforcement personnel at the

taxpayer's expense, it is believed and therefore averred that the search only resulted in the discovery of a small amount of marijuana (only enough for personal use), a couple of bongs, a grinder and a few marijuana pipes, a hunting knife, BB gun, slingshot, and a lock picking set.

93.    It is believed and therefore averred that several of the Plaintiff's class members received disciplinary charges from Defendant Bucknell that resulted in the payment of private fines and community service, in exchange for confidentiality and no criminal prosecution.

94.    It was alleged that the Defendants found a marijuana grinder containing marijuana residue in one of Plaintiff K.W.'s cabinets in his private residence.

95.    As a result, K.W. received a sanction of a $350 fine paid to Defendant Bucknell, one strike under Bucknell's disciplinary policy, three psychiatric sessions, 20 hours of free labor provided to Defendant Bucknell, permanent probation through Defendant Bucknell, and removal of his privileges to travel abroad.

96.    This further resulted in K.W. being placed on probation with his fraternity and his being evicted from his fraternity house for one semester.

97.    The Defendants allegedly found a marijuana pipe in Plaintiff M.G.'s private residence.

98.    As a result, M.G. received a sanction of a $350 fine paid to Defendant Bucknell, and had to provide 15 hours of free labor to Defendant Bucknell.

99.    Furthermore, his affiliation with his fraternity was terminated.

100.    In addition, all of the Plaintiffs' class members who resided at 23 University Avenue, even the ones who were not alleged or found to be in possession of alleged contraband, were evicted from their private residence and placed in other student housing.

101.    Defendant Lantz would later state that the searches were "based on an ongoing investigation of illicit drug use and seizure of contraband[.]"

102.    This statement is an admission by the Defendants that the searches were executed pursuant to a criminal investigation.

103.    This statement is a further admission by the Defendants that the Defendants acted pursuant to an agreement and plan.

104.    A spokesperson for Defendant Bucknell would similarly later state that "The University was compelled to act based on the frequency of prior incidents by students affiliated with the two residences and the assortment of illicit drugs discovered within a short period prior to the searches[.]"

105.    This statement is another admission by the Defendants that the searches were executed pursuant to a criminal investigation.

106.    The Defendants conducted the unlawful searches as part of a criminal investigation to seek evidence of an unlawful drug distribution network, while following up on misinformation contained in text and/or email messages.

107.   It is believed and therefore averred that Defendants Lantz, Marrara, Badal, Friedberg, Smyer, and Bravman, and likely the remaining Defendants, authorized the unlawful searches to occur, after obtaining incorrect legal advice from Defendant Bromfield, who the Defendants knew was not an independent judicial officer.

108.   The Defendants sought Defendant Bromfield's authorization to proceed with the search, in an effort to protect themselves from being held liable for their obvious unlawful conduct.

109.   The Defendants, however, never sought a determination of whether or not probable cause existed to support the searches in question from an independent judicial officer.

### Retaliation

110.   In response to the Plaintiffs' and the Plaintiffs' class members' stated intention to engage in the instant litigation, Defendant Bucknell, through its employees and agents, sent letters (a copy of the letter is attached as **Exhibit 2**) to the parents or other 2012 legal guardians of the Plaintiffs' class members, breaching the school's promised confidentiality and ignoring the fact that the Plaintiffs' and the Plaintiffs' class members were represented by counsel.

111.   While Defendant Bucknell would later claim that the letters were sent to the addresses students reported to Defendant Bucknell, pursuant to the Handbook,

this action breached the promised confidentiality.

112.    Despite knowing that the Plaintiff's class members were represented by counsel, Defendant Bucknell general counsel sent the letter directly to Plaintiff's class members (and their parents/guardians).

113.    Defendant Bucknell does not represent the Plaintiff's class members in any legal matter and therefore had no legal duty to instruct the Plaintiff's class members to preserve documents.

114.    While the letters claimed to merely be letters requesting the preservation of documents, the letters included unnecessary language about Defendant Bucknell's intention to aggressively defend against the litigation, and cautioned that subpoenas from Defendant Bucknell would be forthcoming.

115.    The letter unnecessarily included a statement regarding the fruits of the unlawful search in an attempt to paint the Plaintiff's class members in a bad light.

116.    The letter implies the existence of undisclosed facts and evidence that the recipient of the letter possesses relevant documents; again attempting to paint the Plaintiff's class members in a bad light.

117.    Furthermore, numerous Plaintiffs' class members were advised via email and/or text message by a member of Defendant Lantz's staff that Defendant Lantz wanted to meet with them in person about the litigation.

118.    While Plaintiffs' class members apparently had a right to decline the

meeting, they were not so advised.

119.    Finally, Defendant Bucknell, through its employees and agents, has essentially threatened that if the instant litigation is filed, the Plaintiff's class members would be waiving confidentiality with respect to all matters related to the unlawful search and any related disciplinary matter.

120.    The unlawful retaliatory conduct was intended to have a chilling effect and to discourage participation in the instant litigation.

121.    The Defendants' actions accomplished its goal and caused a few Plaintiff's class members to decide not to be class representatives.

### Bucknell's Conduct Generally

122.    It is believed and therefore averred that for at least the past four years, Defendant Bucknell has implemented and enforced the following policies and practices:

a.    Requiring students to sign a student housing adhesion contract as a means of attempting to circumvent the requirements of the Fourth Amendment to the Federal Constitution;

b.    Entering the private residences of students without a warrant, probable cause and exigent circumstances, or valid voluntary consent;

c.    Searching the private residences of students without a warrant, probable cause and exigent circumstances, or valid voluntary consent;

d.    Forcing students to pay private funds and to comply with other private sanctions in exchange for confidentiality and an agreement to not refer the matter for criminal prosecution.

    e.  Engaging in threatening or harassing conduct to discourage students from engaging in civil litigation to vindicate their rights.

123.   Defendant Bucknell's actions, in blatantly ignoring the requirements of the Fourth Amendment to the Federal Constitution, and Article I, Section 8, of the Pennsylvania Constitution, is a continuation of Defendant Bucknell's unlawful policy that has been in place for over 45 years.

124.   Specifically, in <u>Commonwealth v. McCloskey</u>, 217 Pa. Super. 432, 435 (Pa. Super. Ct. 1970), the Superior Court of Pennsylvania stated,

> The defendant rented the dormitory room for a certain period of time, agreeing to abide by the rules established by his lessor, the University. As in most rental situations, the lessor, Bucknell University, reserved the right to check the room for damages, wear and unauthorized appliances. Such right of the lessor, however, does not mean McCloskey was not entitled to have a 'reasonable expectation of freedom from governmental intrusion', or that he gave consent to the police search, or gave the University authority to consent to such search.

<u>See also</u> <u>Commonwealth v. Vaughan</u>, 2001 Pa. Super. 374 (Pa. Super. Ct. 2001) (suppressing drug evidence seized during the search of a dorm room at Bucknell University, when District Justice "issued" a search warrant by filling out the form completely, including affixing his jurat, but neglected to sign the warrant over the line "Signature of Issuing Authority.").

## **Class Action Allegations**

125.   Pursuant to Rule 23(a)(1)-(4) of the Federal Rules of Civil Procedure, one or more members of a class may sue as representative parties on behalf of all

members if:

126. The class is so numerous that joinder of all members is impracticable:

    a. The statute of limitations related to the civil rights claims resulting from the February 16, 2012, searches will run on February 16, 2014.

    b. It is estimated that 60 persons alone were injured by the unlawful searches that were conducted on February 16, 2012.

    c. It is believed and therefore averred that during the past <u>two years</u>, an unknown number of additional persons have had their <u>civil rights</u> violated and have been injured by being subjected to the exact same unlawful policies.

    d. It is similarly believed and therefore averred that during the past <u>four years</u>, an unknown number of additional persons have also been injured by the Defendants' <u>breach of contract</u> as a result of engaging in the exact same unlawful conduct.

    e. While a few of these persons are current students of Defendant Bucknell University, many of these persons are no longer students and have moved to locations outside of the Commonwealth of Pennsylvania.

    f. The Defendants are in control of, and withholding, the identities and last known contact information of the Plaintiffs' class members.

    g. Likewise, Defendant Bucknell refuses to engage in informal pre-complaint discovery to identify Plaintiffs.

    h. It is simply not practicable to join each of the persons as an Individual Plaintiff, and to consult with and obtain authorization from each of the persons in question regarding litigation strategy.

127. <u>There are questions of law or fact common to the class</u>: In the instant matter, all of the questions of both law and fact are common to each and every member of the prospective class.

128.    The underlying material facts do not appear to be in dispute.

129.    The following common questions of law apply to the entire class:

a.  When conducting investigations do law enforcement personnel from Defendant Bucknell and/or other agents of Defendant Bucknell need to comply with the Pennsylvania and Federal Constitutions before entering the Plaintiff's class members' private residences?

b.  Did the entity Defendants' and policymaking Defendants' policies and practices of failing to maintain policies, practices, and training that meets the accreditation standards set by The Pennsylvania Law Enforcement Accreditation Program ("PLEAC"), and The Commission on Accreditation for Law Enforcement ("CALEA") cause the Plaintiffs' class members' constitutional injuries?

c.  Did the entity Defendants' and policymaking Defendants' policies and practices of failing to ensure that the Individual Defendants understood the law with respect to (1) the First and Fourth Amendments to the Federal Constitution, (2) Article 8, Section, 1 of the Pennsylvania Constitution, (3) the standards for reasonable suspicion and probable cause, and (4) state and federal search and seizure law, cause the Plaintiffs' class members' constitutional injuries?

d.  Did the entity Defendants' and policymaking Defendants' policies and practices of using law enforcement personnel funded by public monies to conduct Bucknell student disciplinary investigations under the color of state law cause the Plaintiffs' class members' constitutional injuries?

e.  Did Defendant Bucknell's and Defendant Bucknell's policymaking Defendants' policies and practices of requiring Defendant Friedberg to serve two masters – the President of Defendant Bucknell and the Union County District Attorney – cause the Plaintiffs' class members' constitutional injuries?

f.  Did Defendant Bucknell's and Defendant Bucknell's policymaking Defendants' policies and practices of permitting non-law enforcement employees or agents to direct law enforcement functions cause the Plaintiffs' class members' constitutional injuries?

31

g. Did Defendant Bucknell's and Defendant Bucknell's policymaking Defendants' policies and practices of consulting with its General Counsel, as opposed to a neutral judicial officer, about the lawfulness of a search, cause the Plaintiffs' class members' constitutional injuries?

h. Did Defendant Bucknell's and Defendant Bucknell's policymaking Defendants' policies and practices of using law enforcement personnel to conduct Bucknell student disciplinary investigations under the color of state law cause the Plaintiffs' class members' constitutional injuries?

i. Did Defendant Bucknell's and Defendant Bucknell's policymaking Defendants' policies and practices of implementing drug and underage drinking policies that permit (1) selective enforcement, (2) avoidance of the criminal justice system, and (3) penalties that do not rise to the level of the penalties mandated by local, state, and federal law, cause the Plaintiffs' class members' constitutional injuries?

130. The claims or defenses of the representative parties are typical of the claims or defenses of the class in that the claims of the representative parties share a common fact pattern and nucleus of operative fact and are common to each and every member of the prospective class.

131. The representative parties will fairly and adequately protect the interests of the class:

a. The representative parties share a commonality of interest with the prospective class members because they were each subjected to the same policies and resulting conduct that caused the same injuries.

b. There are no identifiable conflicts of interest, or antagonistic or conflicting claims, between the representative parties and the prospective class members.

c. Aside from the instant litigation, the representative parties have no personal or professional relationship with undersigned counsel.

    d.  The representative parties understand and are willing to be actively involved in the litigation process and to see the case through to completion.

    e.  The representative parties understand that they need to place the interest of the class over their personal interests or the interests of undersigned counsel.

132.  Pursuant to Rule 23(b)(1)(A) of the Federal Rules of Civil Procedure, a class action may be maintained if Rule 23(a) is satisfied and if, like the instant matter, prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

    a.  If separate lawsuits are filed, the lawsuits could be assigned to different judges, possibly in different venues based upon diversity of citizenship, who might not interpret the law consistent with each other, which could lead to differing outcomes.

    b.  If separate lawsuits are filed, the lawsuits would likely require at least a trial on damages, which could lead to inconsistent monetary awards being granted to prospective class members for the same or similar injuries.

    c.  If separate lawsuits are filed, the lawsuits will likely require at least a trial on damages, which could lead to inconsistent equitable relief being granted to prospective class members.

133.  Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, a class action may also be maintained if Rule 23(a) is satisfied and if, like the instant matter, the party opposing the class has acted on grounds that apply generally to the

class, so that final injunctive relief or corresponding declaratory relief is appropriate

respecting the class as a whole:

a. The Defendants treated the prospective class members as a single targeted suspect group.

b. The Defendants used the same justification for the search procedure with respect to each of the Plaintiffs' class residences, i.e., the Fourth Amendment did not apply, and the search was permitted by the Student Handbook and General Counsel.

c. The prospective class members were subject to the same or similar disciplinary policy and sanctions.

d. The Defendants treated the prospective class members as a single targeted suspect group when they retaliated against the prospective class members by sending a litigation hold letter to the prospective class members' parents or prior guardians.

e. The Defendants treated the prospective class members as a single targeted suspect group when they retaliated against the prospective class members by threatening to disclose confidential information about the prospective class members if the lawsuit was filed.

f. Defendant Bucknell referred to the threatened litigation by the prospective class members not as potential individual lawsuits but rather as a "stupid threatened case" by "a bunch of spoiled boys[.]"

## The Individual Defendants are Not Immune

134.    The doctrine of qualified immunity shields government officials "from

liability for civil damages insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known."

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

135.   The doctrine protects public officials "from undue interference with their duties and from potentially disabling threats of liability." Wright v. City of Philadelphia, 409 F.3d 595, 599 (3d Cir. 2005).

136.   The Supreme Court has emphasized that the inquiry is whether a reasonable officer could have believed that his or her conduct was lawful, in light of the clearly established law and the information in the officer's possession. See United States v. Glasser, 750 F.2d 1197, 1206 (3rd Cir. 1984), cert. denied, 471 U.S. 818 (1985).

137.   In this regard, qualified immunity immunizes a police officer who reasonably relied on information received from another police officer in formulating probable cause for an arrest. See Rogers v. Powell, 120 F.3d 446, 455 (3d Cir. 1997).

138.   Qualified immunity, however, does not immunize a police officer who intentionally or recklessly ignores well-settled Fourth Amendment law, or obvious facts, such as the lack of (1) a warrant, (2) exigent circumstances and probable cause, or (3) valid voluntary consent.

139.   Moreover, qualified immunity is not a defense that is available to the entity Defendants.

## COUNT I

### Plaintiffs v. Individual Defendants
### Violation of the Fourth Amendment to the Federal Constitution
### asserted pursuant to 42 U.S.C. § 1983

140.   Paragraphs 1 through 139, are incorporated herein by reference.

141.   The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." United States v. United States District Court, 407 U.S. 297, 313, (1972).

142.   United States v. Zimmerman, 277 F.3d 426, 431 (3d Cir. 2002) (quoting Payton v. New York, 445 U.S. 573, 585 (1980) ("One's home is sacrosanct, and unreasonable government intrusion into the home is 'the chief evil against which the wording of the Fourth Amendment is directed'."); see also United States v. Mitchell, 2010 U.S. Dist. LEXIS 105594 (M.D.Pa. 2010).

143.   While the Fourth Amendment applies regardless of whether or not the "police" conduct the search, in this case, the searches in question were conducted by law enforcement officers from Bucknell University, the Union County Sheriff's Department, and the Montour County Sheriff's Department.

144.   "The point of the Fourth Amendment which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead

of being judged by the officer engaged in the often competitive enterprise of ferreting out crime . . . . When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." Johnson v. United States, 333 U.S. 10, 13-14 (1948).

145.   A decision by Defendant Bromfield, the employee of and General Counsel to Defendant Bucknell, certainly does not pass constitutional muster.

146.   It is axiomatic that a university has the inherent power to promulgate rules and regulations, protect itself and its property, issue discipline, and expect that its students adhere to generally accepted standards of conduct. See Esteban v. Central Missouri State College, 415 F.2d 1077, 1089 (8th Cir. 1969), cert. denied, 398 U.S. 965 (1970); see also Healy v. James, 408 U.S. 169, 192 (1972).

147.   University students, however, have constitutional rights that must be respected and protected.

148.   The prospective Plaintiffs' class members' rooms were their private residences, and they enjoyed the same interest in the privacy of their dormitory rooms as any other adult would in the privacy of their home.

149.   A blanket authorization in an adhesion contract such as Bucknell's Student Handbook that the University may conduct searches of student housing for the purpose of discovering violations of university policy and/or local, state, or federal law, all of which may be amended at any time, pursuant to whatever search

protocol the University chooses to adopt, is not the type of focused, deliberate, and immediate consent contemplated by the Constitution, and therefore not valid voluntary consent. Cf., Piazzola v. Watkins, 442 F.2d 284 (5th Cir. 1971); Commonwealth v. McCloskey, 272 A.2d 271 (Pa. 1970).

150.   The Third Circuit has recognized that officers, regardless of rank or seniority, can be held liable pursuant to §1983 for failing to intervene when a constitutional violation takes place in his/her presence. See Smith v. Mensinger, 293 F.3d 641, 650-51 (3d Cir. 2002); see also Randall v. Prince George's County, 302 F.3d 188, 203-04 (4th Cir. 2002); Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994).

151.   An officer that does not intervene when a constitutional violation takes place in his/her presence will be liable if there was a "realistic and reasonable opportunity to intervene." Smith, 293 F.3d at 651.

152.   All of the Individual Defendants either participated in the unlawful searches in question or had a realistic and reasonable opportunity to intervene to prevent or stop the searches but failed to do so.

153.   The searches in question were conducted by law enforcement personnel, focused on the rooms of individuals who the University had profiled and targeted as being persons who might be inclined to utilize marijuana and/or other

illegal drugs or alcohol, and was aimed at discovering specific evidence of criminal wrongdoing and/or other violations of University policy.

154.   As the Defendants involved in the unlawful searches should have known and considered, the U.S. Attorney, PA Attorney General, and local District Attorney, not University officials, ultimately decides whether or not to prosecute alleged violations of state and federal law.

155.   As such, the fact that Bucknell University deferred in most cases to its own internal disciplinary process to prosecute alleged violations of state law, did not guarantee that civil authorities would not intrude into the University's affairs, and did not ensure that the prospective Plaintiffs' class would not fall subject to formal criminal proceedings.

156.   Moreover, the mere fact of arrest, and certainly any documented internal disciplinary findings, either did or will seriously damage the students' standing with fellow students and teachers, as well as interfere with future opportunities for higher education and employment.

157.   Therefore, the search in question, regardless of the University's stated good intentions and excuse that the ends justifies the means, placed the prospective Plaintiffs' class in severe jeopardy and clearly violated the Fourth Amendment to the Federal Constitution.

158.   As a direct and proximate result of the violation of their Fourth Amendment rights, the Plaintiffs and Plaintiffs' class members suffered and will continue to suffer embarrassment, humiliation, damage to reputation, and financial harm, some or all of which may be permanent.

159.   As a direct and proximate result of the violation of their Fourth Amendment rights and the prosecution of the instant litigation, Plaintiffs and Plaintiffs' class members have incurred and will incur attorneys' fees and other costs.

## COUNT II

**Plaintiffs v. Bucknell Defendants**
**Violation of the First Amendment to the Federal Constitution**
**asserted pursuant to 42 U.S.C. § 1983**

160.   Paragraphs 1 through 159, are incorporated herein by reference.

161.   To make out a First Amendment retaliation claim pursuant to §1983, a Plaintiff must establish three elements: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal connection between the constitutionally protected conduct and the retaliatory action. See Cooper v. Menges, 2013 U.S. App. LEXIS 20110, 2013 WL 5458015 at *3 (October 2, 2013 3d Cir.) (quoting Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006).

162.  To establish a causal connection, a Plaintiff must prove either "an unusually suggestive temporal proximity between the protected activity and allegedly retaliatory action" or "a pattern of antagonism coupled with timing to establish a causal link." Cooper, 2013 U.S. App. LEXIS 20110, 2013 WL 5458015 at *3 (quoting Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

163.  The Plaintiffs' and Plaintiffs' class members' right to file the instant litigation is constitutionally protected conduct.

164.  The immediate response discussed herein to the stated intention to file the instant litigation was sufficient to deter a person of ordinary firmness from proceeding with the litigation.

165.  The Defendants' actions were directly linked to the Plaintiffs' and Plaintiffs' class members' constitutionally protected activities.

166.  As a direct and proximate result of the violation of their First Amendment rights, the Plaintiffs and Plaintiffs' class members suffered and will continue to suffer embarrassment, humiliation, damage to reputation, and financial harm, some or all of which may be permanent.

167.  As a direct and proximate result of the violation of their First Amendment rights and the prosecution of the instant litigation, Plaintiffs and

Plaintiffs' class members have incurred and will incur attorneys' fees and other costs.

## COUNT III

**Plaintiffs v. Defendants Lantz, Marrara,**
**Badal, Friedberg, Bromfield, Smyer, Bravman, and Ritter**
**Violation of the First and/or Fourth Amendments – <u>Supervisory Liability</u>**
**asserted pursuant to 42 U.S.C. § 1983**

168.    Paragraphs 1 through 167 are incorporated herein by reference.

169.    A supervisor may be personally liable under § 1983 if s/he participated in violating the Plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his/her subordinates violations. <u>See Cosby v. Magnotta</u>, 2014 U.S. Dist. LEXIS 24471 (M.D.Pa. 2014); <u>A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.</u>, 372 F.3d 572, 586 (3d Cir. 2004).

170.    As discussed herein, the aforementioned Defendants each personally participated in, directed, or acquiesced in the conduct that caused the Plaintiffs' and Plaintiffs' class members' constitutional injuries.

171.    As a direct and proximate result of the violation of their First and Fourth Amendment rights, the Plaintiffs and Plaintiffs' class members suffered and will continue to suffer embarrassment, humiliation, damage to reputation, and financial harm, some or all of which may be permanent.

172.    As a direct and proximate result of the violation of their First and Fourth Amendment rights and the prosecution of the instant litigation, Plaintiffs and

Plaintiffs' class members have incurred and will incur attorneys' fees and other costs.

## COUNT IV

**Plaintiffs v. Defendants Lantz, Marrara,
Badal, Friedberg, Bromfield, Smyer, Bravman,
Ritter, Bucknell, Union County, and Montour County
Violation of the First and/or Fourth Amendments – <u>Failure to Train</u>
asserted pursuant to 42 U.S.C. § 1983**

173.   Paragraphs 1 through 172 are incorporated herein by reference.

174.   To state a claim for failure to train, a Plaintiff must establish that the supervising Defendant's "failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." <u>City of Canton v. Harris</u>, 489 U.S. 378, 388 (1989).

175.   The standard of deliberate indifference requires proof that the supervisor "disregarded a known or obvious consequence of his action." <u>Board of the County Comm'rs v. Brown</u>, 520 U.S. 397, 410 (1997).

176.   A pattern of similar constitutional violations by untrained employees will generally establish deliberate indifference for purposes of failure to train. <u>See Connick v. Thompson</u>, 131 S.Ct. 1350, 1359.

177.   Additionally, a "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees" will likely also constitute deliberate indifference. <u>See</u> <u>id</u>.

178.   For decades, the Defendants knowingly permitted their employees and/or law enforcement officers in their employ to engage in conduct similar or identical to the conduct discussed herein, despite knowing that the employees and/or officers did not understand applicable state and federal law.

179.   Despite knowing of the aforementioned unlawful conduct, the Defendants failed to provide additional training in an effort to remedy the unlawful conduct.

180.   The County Defendants knew that the situation would be confronted by their employees and that it would involve a difficult choice.

181.   Moreover, it is believed and therefore averred that discovery will yield evidence of a history of mishandling and that the County Defendants knew that the wrong choice would often lead to constitutional deprivations.

182.   Specifically, it is believed and therefore averred that discovery will yield evidence of the following:

  a. The County Defendants knew that their law enforcement personnel provided mutual aid assistance to Bucknell University;

  b. The County Defendants knew or should have known that students were required to live in student housing;

c.  The County Defendants knew or should have known that neither the County nor its officials or employees were party to any contract with any Bucknell student;

d.  The County Defendants knew or should have known that they were funded by taxpayer money and not by private money;

e.  The County Defendants knew or should have known that they have been asked and would again be asked to participate in the search for drugs when they acquired specially trained drug canines.

f.  The County Defendants knew or should have known that they would need to know whether state and federal law would permit them to use their specially trained drug canines in foreseeable circumstances.

g.  The County Defendants knew or should have known that enforcing or attempting to enforce the administrative or disciplinary policies of a private university does not fall within the scope of their legal duties;

h.  The County Defendants knew or should have known that in the event that evidence of a crime was discovered during a search of Bucknell student housing, a decision would need to be made regarding whether or not they were required to file criminal charges.

     i.  Despite knowing of its existence, the County Defendants never reviewed the contract that they now claim provided them with the authority to conduct the search in question.

     j.  The County Defendants never provided the County Defendants with any training regarding their authority to take any legal action on the campus of a private university or in student housing.

183.  The Defendants' deliberately indifferent conduct directly caused the Plaintiffs' and Plaintiffs' class members' injuries.

184.  As a direct and proximate result of the violation of their First and Fourth Amendment rights, the Plaintiffs and Plaintiffs' class members suffered and will continue to suffer embarrassment, humiliation, damage to reputation, and financial harm, some or all of which may be permanent.

185.  As a direct and proximate result of the violation of their First and Fourth Amendment rights and the prosecution of the instant litigation, Plaintiffs and Plaintiffs' class members have incurred and will incur attorneys' fees and other costs.

## COUNT V

**Plaintiffs v. Defendants Lantz, Marrara,
Badal, Friedberg, Bromfield, Smyer, Bravman,
Ritter, Bucknell, Union County, and Montour County
Violation of the First and/or Fourth Amendment – Municipal Liability
asserted pursuant to 42 U.S.C. § 1983**

186.   Paragraphs 1 through 185 are incorporated herein by reference.

187.   "Local governing bodies . . . can be sued directly under § 1983 for
monetary, declaratory, or injunctive relief where . . . the action that is alleged to be
unconstitutional implements or executes a policy statement, ordinance, regulation,
or decision officially adopted and promulgated by that body's officers." Monell v.
Dep't of Soc. Servs., 436 U.S. 658, 690 (1978).

188.   To establish that a municipality supported the violation of rights
alleged, a Plaintiff must show the "execution of a government's policy or custom,
whether made by its lawmakers or by those whose edicts or acts may fairly be said
to represent official policy, inflicts the injury." Monell, 436 U.S. at 694.

189.   To establish public policy or custom, a Plaintiff must show that a
policymaker is responsible either for the policy, or through acquiescence, for the
custom, or that authorized policymakers approved a subordinate's decision and the
basis for same.

190.   As discussed herein, policymakers of the Defendant municipalities and
entity either participated in, authorized, or acquiesced in, the unlawful conduct

47

discussed herein; or adopted, implemented, and enforced, policies and practices that did not comport with state and federal law.

191.   As a direct and proximate result of the violation of their First and Fourth Amendment rights, the Plaintiffs and Plaintiffs' class members suffered and will continue to suffer embarrassment, humiliation, damage to reputation, and financial harm, some or all of which may be permanent.

192.   As a direct and proximate result of the violation of their First and Fourth Amendment rights and the prosecution of the instant litigation, Plaintiffs and Plaintiffs' class members have incurred and will incur attorneys' fees and other costs.

<u>**COUNT VI**</u>

**Plaintiffs v. Individual Defendants**
**Violation of Article I, Section 8 of the Pennsylvania Constitution**
**Seeking Declaratory and Equitable Relief Only**

193.   Paragraphs 1 through 192 are incorporated herein by reference.

194.   Article I, Section 8 of the Pennsylvania Constitution, guarantees that people will be secure from unreasonable searches of their houses.

195.   The Defendants' conduct discussed herein violates Article I, Section 8 of the Pennsylvania Constitution.

196.   As a direct and proximate result of the violation of their rights pursuant to Article I, Section 8 of the Pennsylvania Constitution, the Plaintiffs and Plaintiffs'

class members suffered and will continue to suffer embarrassment, humiliation, damage to reputation, and financial harm, some or all of which may be permanent.

197.   As a direct and proximate result of the violation their rights pursuant to Article I, Section 8 of the Pennsylvania Constitution and the prosecution of the instant litigation, Plaintiffs and Plaintiffs' class members have incurred and will incur attorneys' fees and other costs.

## COUNT VII

### Plaintiffs v. Bucknell Defendants
### Breach of Contract

198.   Paragraphs 1 through 197, are incorporated herein by reference.

199.   A claim for breach of contract by a student against a university requires: (1) the existence of a contract and its terms; (2) a breach of the duty imposed by the contract; and (3) damages that resulted. See Furey v. Temple University, 730 F.Supp.2d 380, 400 (E.D. Pa. 2010) (citing CoreStates Bank v. Cutillo, 723 A.2d 1053, 1058 (Pa.Super.Ct. 1999)); see also Hart v. Univ. of Scranton, 2012 U.S. Dist. LEXIS 42629 (M.D.Pa. 2012).

200.  In Pennsylvania, "the relationship between a private educational institution and an enrolled student is contractual in nature." Swartley v. Hoffner, 734 A.2d 915, 919 (Pa. Super. Ct. 1999).

201.    This contractual arrangement is derived solely from "the written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of their enrollment in the institution." Id.

202.    Despite its claim to be otherwise, the Bucknell Student Handbook is an adhesion contract that existed between the Defendants and the Plaintiffs and Plaintiffs' class members.

203.    The Defendants' conduct discussed herein violated the aforementioned stated terms of the Student Handbook.

204.    As a direct and proximate result of the breach of contract, the Plaintiffs and Plaintiffs' class members suffered and will continue to suffer embarrassment, humiliation, damage to reputation, and financial harm, some or all of which may be permanent.

205.    As a direct and proximate result of the breach of contract, the Plaintiffs and Plaintiffs' class members have incurred and will incur attorneys' fees and other costs.

## COUNT VIII

### Plaintiffs v. Defendant Bucknell University
### Vicarious Liability

206.    Paragraphs 1 through 205 are incorporated herein by reference.

207.    Under Pennsylvania law, "[a]n employer is vicariously liable for the wrongful acts of an employee if that act was committed during the course of and

within the scope of employment." <u>Brezenski v. World Truck Transfer, Inc.</u>, 755 A.2d 36, 39 (Pa. Super. Ct. 2000).

208.   The Individual Defendants' conduct discussed herein occurred during the scope of their employment, violates state and Federal law, and breached the contract that existed between the Bucknell Defendants and the Plaintiffs and Plaintiffs' class members.

209.   Therefore Defendant Bucknell University is vicariously liable for the unlawful actions of its employees.

210.   As a direct and proximate result of the Defendants' conduct, the Plaintiffs and Plaintiffs' class members suffered and will continue to suffer embarrassment, humiliation, damage to reputation, and financial harm, some or all of which may be permanent.

211.   As a direct and proximate result of the Defendants' conduct and the prosecution of the instant litigation, Plaintiffs and Plaintiffs' class members have incurred and will incur attorneys' fees and other costs.

## COUNT IX

**Plaintiffs v. Defendants**
**(Excluding Defendants Union and Montour Counties)**
**Civil Conspiracy**

212.   Paragraphs 1 through 211 are incorporated herein by reference.

213.    In Pennsylvania, to state a cause of action for civil conspiracy, a Plaintiff must establish "that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means. Proof of malice, i.e., an intent to injure, is essential in proof of a conspiracy." Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (1979) (citations omitted).

214.    The Defendants acted with malice, and without legal justification.

215.    The Defendants' aforementioned conduct establishes the existence of an unlawful conspiracy.

216.    As a direct and proximate result of the Defendants' conduct, the Plaintiffs and Plaintiffs' class members suffered and will continue to suffer embarrassment, humiliation, damage to reputation, and financial harm, some or all of which may be permanent.

217.    As a direct and proximate result of the Defendants' conduct and the prosecution of the instant litigation, Plaintiffs and Plaintiffs' class members have incurred and will incur attorneys' fees and other costs.

**WHEREFORE**, the Plaintiffs and Plaintiffs' class members, respectfully request the following relief:

A.    That the Court provide them with a federal jury trial;

B.    That judgment be entered in favor of the Plaintiffs and Plaintiffs' class members and against the Defendants;

C.      That the Court declare that the Defendants' actions violated the Plaintiffs' and Plaintiffs' class members' state and federal rights;

D.      That the Court award the Plaintiffs and Plaintiffs' class members compensatory damages;

E.      That with the exception of Defendant Montour County and Union County, the Court award the Plaintiffs and Plaintiffs' class members punitive damages;

F.      That the Court award the Plaintiffs and Plaintiffs' class members equitable relief to include but not be limited to (1) the sealing of all documents related to any criminal or disciplinary matter, (2) the expungement of any related criminal or disciplinary record, (3) the issuance of a gag order preventing the Defendants and their agents and employees from commenting on the underlying conduct or the instant litigation, (4) the issuance of a protective order precluding the Defendants from publicly identifying or otherwise disclosing the identity of any Plaintiffs' class member, and precluding the Defendants from engaging in further retaliatory conduct;

G.      That the Court award the Plaintiffs and Plaintiffs' class members injunctive relief to include but not be limited to (1) the retraction of any official or unofficial statements made about the underlying conduct, (2) the immediate discontinuance of all policies and practices determined to be unlawful, (3) the

immediate discontinuance of the operation of law enforcement agencies, public safety departments, or similar type security or law enforcement groups below standards set by state or national accrediting organizations;

H.    That the Court award the Plaintiffs and Plaintiffs' class members their attorney's fees, costs and interest; and

I.    That the Court award such other financial or equitable relief as is reasonable and just.

**Respectfully Submitted,**

_____                              **Date: March 11, 2014**
**DEVON M. JACOB, ESQUIRE**
Pa. Sup. Ct. I.D. 89182
Counsel for Plaintiffs

**JACOB LITIGATION**
P.O. Box 837, Mechanicsburg, Pa. 17055-0837
717.796.7733 | djacob@jacoblitigation.com