IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KEVIN WAGNER, *et. al.,*       :       4:13-CV-3051
      :
      :
      Plaintiffs,       :       (Judge Brann)
    v.       :
      :
JULIE A. HOLTZAPPLE, *et. al.,*       :
      :
      Defendants.       :

**M E M O R A N D U M**

April 23, 2015

## I. BACKGROUND:

This case presents a question about the constitutionality of a search and seizure in a college dormitory environment. The primary issue presented cannot be decided by the Court at the motion to dismiss stage of the proceedings, and, consequently, several of the claims will proceed to discovery.

## II. DISCUSSION:

### A. Procedural History

Plaintiffs, Kevin Wagner, Fraiser Etsy, and Tony Migliori, are three former students at Bucknell University in Lewisburg, Pennsylvania, who filed a complaint

on December 19, 2013.[1]  Plaintiffs filed an amended complaint on March 11, 2014, and a second amended complaint on July 23, 2014.  ECF No. 36.

Defendants as a collective group acted in concert, but can be classified into two general categories.  Defendants Julie A. Holtzapple, James R. Middleton, Michael C. Giffiths, Degg H. Stark, Susan L. Lantz, Jason D. Friedberg, Lewis A. Marrara, II, Amy A. Badal, Wayne A. Bromfield, Michael A. Smyer, John C. Bravman, and Bucknell University  are all related to Bucknell and, will hereinafter be collectively referred to as the "Bucknell Defendants").  The second group of defendants are Ernest R. Ritter, III, Jeffrey A. Tice, Justin N. Rosbosch[2], Ryan E. King, Union County, Pennsylvania, and Montour County, Pennsylvania, and are all related to these counties and will hereinafter be referred to collectively as the "County Defendants".

On August 6, 2014 both sets of defendants filed motions to dismiss the second amended complaint.  For the reasons that follow, the motions will be

---

[1]Plaintiffs filed the complaint on behalf of a putative class, but missed the deadline to file a motion for class certification.  Accordingly, the action is proceeding on behalf of the three named plaintiffs only.  *See* August 29, 2014 Order, ECF. No. 54

[2]Defendant indicates in his motion that his name is spelled Rosbosch, not Rosboschil, as Plaintiffs spelled it. ECF No. 43 at 1. Accordingly, he will be referred to by this Court with the amended and presumably correct spelling and the clerk will be directed to correct the docket.

granted in part and denied in part.

### B.  Motion to Dismiss Standard

When considering a motion to dismiss under Federal Rule of Civil

Procedure 12(b)(6), a court must view all allegations stated in the complaint as

true and construe all inferences in the light most favorable to plaintiff.  *Hishon v.*

*King & Spaulding*, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984); *Kost*

*v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  However,  "the tenet that a court

must accept as true all of the [factual] allegations contained in the complaint is

inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.

Ct. 1937, 173 L. Ed. 2d 868 (2009) (internal citations omitted).   In ruling on such

a motion, the court primarily considers the allegations of the pleading, but is not

required to consider legal conclusions alleged in the complaint.  *Kost*, 1 F.3d at

183.  "Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  At the motion to

dismiss stage, the court considers whether plaintiff is entitled to offer evidence to

support the allegations in the complaint.  *Maio v. Aetna, Inc.*, 221 F.3d 472, 482

(3d Cir. 2000).

A complaint should only be dismissed if, accepting as true all of the

allegations in the amended complaint, plaintiff has not pled enough facts to state a

3

claim to relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L. Ed. 2d 929 (2007). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-664.

"In considering a Rule 12(b)(6) motion, we must be mindful that federal courts require notice pleading, as opposed to the heightened standard of fact pleading." *Hellmann v. Kercher*, 2008 U.S. Dist. LEXIS 54882, *4, 2008 WL 1969311 (W.D. Pa. May 5, 2008) (Lancaster, J.). Federal Rule of Civil Procedure 8 "'requires only a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the…claim is and the grounds on which it rests,'" *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. at 1964 (citing *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)). However, even under this lower notice pleading standard, a plaintiff must do more than recite the elements of a cause of action, and then make a blanket assertion of an entitlement to relief under it. *Hellmann*, *supra*. Instead, a plaintiff must make a factual showing of his entitlement to relief by alleging sufficient facts that, when taken as true, suggest the required elements of a particular legal theory. *Twombly*, 127 S.Ct. at 1965. "[W]here the well-pleaded facts do not permit the

court to infer more than the mere possibility of misconduct, the complaint has alleged - - but it has not "shown" - - "that the pleader is entitled to relief." *Iqbal*, *supra*, *citing* Fed. R. Civ. P. 8(a).

The failure-to-state-a-claim standard of Rule 12(b)(6) "streamlines litigation by dispensing with needless discovery and factfinding." *Neitzke v. Williams*, 490 U.S. 319, 326-27, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989).  A court may dismiss a claim under Rule 12(b)(6) where there is a "dispositive issue of law." *Id*. at 326.  If it is beyond a doubt that the non-moving party can prove no set of facts in support of its allegations, then a claim must be dismissed "without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." *Id.* at 327

### C.  Allegations in the Complaint

The alleged facts as set forth by Plaintiffs in the second amended complaint are as follows.  Plaintiffs Kevin Wagner, Fraiser Etsy, and Tony Migliori were all Bucknell University students who resided in a fraternity house located at 64 University Avenue, Lewisburg, Union County, Pennsylvania at the time period in question.

*The Bucknell Defendants.* Defendant Bucknell University is a private,

liberal arts university located in Lewisburg, Pennsylvania. Julie A. Holtzapple, James R. Middleton, Michael C. Griffiths, and Degg H. Stark are public safety officers. Jason D. Friedberg is employed as Bucknell's Chief of Police. Susan L. Lantz and Lewis A. Marrara, II are both Deans of Students. Amy A. Badal is an Assistant Dean of Students. Wayne A. Bromfield was General Counsel of Bucknell as of the date of the incident in question. Michael A. Smyer is the Provost. John C. Bravman is the President.

*The County Defendants*. Ernest R. Ritter, III is the Sheriff of Union County, Pennsylvania. Jeffrey A. Tice and Justin M. Rosbosch are Union County Deputy Sheriffs. Ryan E. King is a Montour County, Pennsylvania Deputy Sheriff. Defendants Union and Montour counties are located in north central Pennsylvania and maintain control over their respective Sheriff's Offices.

Plaintiffs allege that all of the named individual defendants were acting under color of state law and are sued in their respective personal capacities. Moreover, Plaintiffs allege that the Bucknell University defendants, although employed by a private employer, were acting under color of state law, a claim that the Bucknell Defendants, for the most part, do not dispute.

Taking the facts alleged in the complaint as true, the narrative that unfolds is as follows. On February 16, 2012, Defendants Holtzapple, Middleton, Griffiths,

6

Stark, Ritter, Tice, Rosbosch and King entered the Kappa Sigma Alphi Phi fraternity house, where the three Plaintiffs resided, and set off the fire alarm.  The residents of the building exited the building.  Defendants used the "C-CURE Access Control System[3] to lock the doors so that the Plaintiffs...could not renter the buildings." ECF No. 36 at 20.   Once inside, these Defendants, along with search dogs, searched the building for three hours.  Plaintiffs allege that the Defendants conducted a search that exceeded a "plain sight" search, in that unopened doors were opened, bookbags searched, dresser drawers searched and the space underneath beds was searched.  The search resulted in the discovery of a small amount of marijuana, "a couple of bongs," a "grinder," a few marijuana piper, a hunting knife, a BB gun, a slingshot, and a lock picking set.  Plaintiffs were never prosecuted criminally, but received internal discipline from Bucknell that required payment of a fine and community service, and, for one Plaintiff, three psychiatric sessions.

Like most universities, Bucknell has a Student Handbook (hereinafter "the handbook").  Plaintiffs assert that the handbook was not a negotiable document, but was a "take it or leave it" proposition; specifically, they allege that it was a

---

[3]Plaintiffs never explain what the C-CURE Access Control System is. Presumably it is a Bucknell controlled master lock system.

contract of adhesion.  ECF No. 36 at 13 ¶¶ 44 and 46.   The salient provisions of

the handbook provide as follows:

> Bucknell requires all undergraduate students to live on campus in a University-owned facility or University-related fraternity house unless they receive formal approval to reside off campus or commute from home.

> Campus residential facilities are the same as any private facility and cannot be entered by police without the occupant's permission or a legal search warrant.

> A private room may be opened by an RA or member of the University staff if there is reasonable cause to suspect violation of the law or Student Code of Conduct is occurring.

> The University reserves the right to enter your room in an emergency or if there is reasonable cause to conclude that violation of University policy, or state or federal law, is occurring.

> Public Safety officers may enter your room any time they believe a crime or violation has been, is about to be, or is being committed.  In most circumstances the officer will knock and announce that "Bucknell Public Safety is requesting entry."  However, exigent circumstance dictate both internally and externally that an officer can key into your room without waiting to be granted access.  This includes failure to answer your door when someone is believed to be inside, at which time officers are required to enter to check on the persons' well-being.

> If you are not in your room, a Public Safety officer will enter the room, usually with another officer or RA, to witness the room entry.

> Room search are conducted if there is reasonable suspicion to believe a

8

crime or violation has been, is about to be, or is being committed.

A search following a crime committed in a room in plain sight of an officer can only involve the areas of plain sight.  Public Safety officers may not search any closed areas (such as drawers, closets or bags) without permission of the student, permission from the Dean of Students, and/or a search warrant.

Illegally possessed alcohol, drugs, firearms, and fireworks can be confiscated from dorm rooms and destroyed.  Discovery of such items may result in internal and/or external charges being filed.

In the event of an emergency, or if there is reasonable cause to believe that a violation of University policy or state or federal law is occurring or has occurred or exigent circumstances exist, Bucknell reserves the right, exercised through Department of Public Safety officers or other duly authorized University officials, to enter any University-owned or University-supervised residence unit, room or area to conduct a "plain view search" of the room or space, including the refrigerator, or to take appropriate action in response to an emergency whether or not the occupant(s) is present.  A full search of a residence unit, room or area may be authorized by the Dean of Students or his/her designee when there is a reason to believe that there is contraband or ongoing illegal activity or a violation of University regulations, policy or procedures in that unit, room or area, or there exists a danger to the building or the safety of its occupants.

Periodic inspections are made by members of the Facilities or Housing Services or Residential Education staffs to determine the need for repairs, redecorating or to evaluate the general condition, safety, and maintenance of the room.  Unless otherwise specified in the residence hall contract, notifications of such inspections must be given 24 hours in advance.

It is both a criminal and University offense to tamper with a fire alarm

or smoke detector without cause or to damage or unnecessarily discharge a fire extinguisher.

The respondent and the aggrieved party generally have the right to be assured that his/her involvement in a Student Code of Conduct violation or identity will not be disclosed by the University except as required by law, to anyone other than those involved in the University conduct process unless prior notification is given by both students.  There are three possible exceptions: 1) if a second or serious alcohol transgression or four (4) alcohol points are involved, parents/guardians can be notified; 2) if illegal drugs are involved, both parents/guardians and legal authorities can be informed; and 3) if a party directly or indirectly involved in the case misrepresents what happened in the hearing process or outcome, the University reserves the right to provide publicly a truthful account of the situation.

Bucknell communicates with the student directly and releases information about a student to others, including parents, only with the student's consent.

The release by University personnel of other information, including communications to parents from academic deans, individual faculty members, the student's faculty adviser, and staff members of the Office of the Deans of Students, requires the consent of the student prior to each release.

When the University believes it appropriate in its sole discretion, the University will release to a student's parent or legal guardian information regarding that student's violation of any federal, state or local law or any rule or policy of the University governing the use or possession of alcohol or a controlled substance if (a) the student is under the age of 21 and (b) the University determines that the student has committed a disciplinary violation with respect to that use or possession.

Student files are maintained in the Dean of Students' Office from the time of a student's first enrollment until five (5) years after graduation or departure from the University.  Included in these records are behavioral incidents; student work history; appointment to committees, boards, task forces, etc.; honors; the Summary Data Form the student completes during senior year; and other materials.  It is on the basis of these records that the Deans of Students complete various kinds of recommendations and references.  Information is not generally released to third parties without the student's permission. There are two main areas of exception: parents will be notified when a student is involved in an initial alcohol violation that is relatively serious or any second alcohol infraction; and information is shared with the legal authorities upon receipt of a court order.  Students should understand that infractions contained in a student's record may be reported without interpretation.

Records of conduct proceedings are maintained in the individual student's file normally for a period of nine (9) years - four (4) active undergraduate years plus five (5) additional years [or five (5) years following the date of last attendance.]

Records maintained by the Department of Public Safety may be maintained indefinitely and will be discoverable if a check of records is conducted.

ECF No. 36 at 13-17

The motions to dismiss moved to dismiss all nine counts of the second amended complaint, and additionally, the County Defendants included a motion to strike.  Each count and the motion to strike will be addressed in turn.

### D.  Analysis

#### 1.  Count I: Plaintiffs v. Individual Defendants
*Violation of the Fourth Amendment to the Federal Constitution asserted pursuant to 42 U.S.C. § 1983*

In order for plaintiffs to prevail under 42 U.S.C. § 1983, they must establish two elements: first, that the conduct complained of was committed by a person acting under color of state law; and second, that the conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States.  *See Kost v. Kozakiewicz*, 1 F.3d 176, 184 (3d Cir. 1993).

The County Defendants argue that Count I should be dismissed as Plaintiffs waived their Fourth Amendment protections based on their assent to governance by the Bucknell Student Handbook, and, additionally, that they are entitled to qualified immunity.  ECF No. 49 at - 14-17.  The Bucknell Defendants assert the same two arguments, and, additionally, make a third argument of  good faith reliance on the advice of counsel defense.  ECF No. 51 at 11-20.  The Bucknell Defendants are able to make the qualified immunity argument as they have acquiesced to the assertion that they acted under color of state law as to the Fourth Amendment claims

Plaintiffs argue that to survive a motion to dismiss, they must have pled

12

only that a search was violative of their Constitutional rights, because there was no consent, no warrant, and no exception to the warrant requirement, i.e. neither probable cause nor exigent circumstances.  Further, plaintiffs argue that the Bucknell Defendants are not entitled to qualified immunity because Fourth Amendment law is well settled and it was unreasonable to rely on legal advice that the search was allowable.

Each argument will be taken in turn.  First, the assertion that Count I should be dismissed generally as not a constitutionally violative search, and second, that even if it was a constitutionally violative search, the Defendants should be immune from liability.

*A.  The search*

The Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. " US. CONST. amend. IV.

"[T]he Fourth Amendment protects people, not places." *Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 511, 19 L. Ed. 2d 576 (1967)*.*  "[W]hat he

seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Id.* "Wherever a man may be, he is entitled to know that he will remain free from unreasonable searches and seizures." *Id.* at 359. A search to which an individual consents meets Fourth Amendment requirements. *See id.* at 357.

Case law with regard to searches and seizures of dormitories has not developed in a universal manner, as the law surrounding the student-university relationship has changed considerably in a relatively short period of time. "The early period of American higher education, prior to the 1960s, was exclusively associated with the doctrine of in loco parentis." Jason A. Zwara, Student Privacy, Campus Safety, and Reconsidering the Modern Student-University Relationship, 38 J.C. & U.L. 419, 432 (2012) (internal citation omitted). "In loco parentis was applied in the early period of higher education law to prevent courts or legislatures from intervening in the student-university relationship, thus insulating the institution from criminal or civil liability or regulation." *Id.* "Courts began to shift away from in loco parentis beginning in the civil rights era of the 1960s through a number of cases addressing student claims for constitutional rights, in particular due process rights and free speech." *Id.*

Notably, in 1976, Chief Judge David P. Lay wrote for the United States

14

Court of Appeals for the Eighth Circuit that "[t]he relationship between a university and a student is contractual in nature." *Corso v. Creighton Univ.,* 731 F.2d 529, 531 (8th Cir. 1984) *citing, e.g., Williams v. Howard University*, 528 F.2d 658, 660-61, (D.C.Cir.), *cert. denied*, 429 U.S. 850, 97 S.Ct. 138, 50 L.Ed.2d 123 (1976). "[T]he [] University Handbook for Students [] is the primary source of the terms governing the parties' contractual relationship." *Id.*

Contemporaneously with the decline of the *in loco parentis* doctrine and subsequent move to view the student-univeristy relationship as one of contract, courts also began to hold that "a student who occupies a college dormitory room enjoys the protection of the Fourth Amendment." *Piazzola v. Watkins*, 442 F.2d 284, 289 (5th Cir. 1971). Courts reasoned that "[t]he plaintiff's dormitory room is his house and home for all practical purposes, and he has the same interest in the privacy of this room as any adult has in the privacy of his home, dwelling, or lodging." *Smyth v. Lubbers*, 398 F. Supp. 777, 786 (W.D. Mich. 1975); *but see, State v. Hunter, 831 P.2d 1033, 1036 (Utah Ct. App. 1992)* (holding that the right of privacy protected by the Fourth Amendment does not include freedom from reasonable inspection of a school-operated dormitory room by school officials as a reasonable exercise of the university's authority to maintain an educational environment.)

As Judge J. David Frazier of the Washington Superior Court explained,

> An individual has a privacy interest in the interior of his or her home. *E.g., Payton v. New York*, 445 U.S. 573, 589-90, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *State v. Ferrier*, 136 Wash.2d 103, 960 P.2d 927 (1998). This privacy interest extends to other types of residences, even temporary ones. *E.g., Stoner,* 376 U.S. at 490, 84 S.Ct. 889 (hotel rooms); *State v. Davis*, 86 Wash.App. 414, 419, 937 P.2d 1110 (1997) (motel rooms); *McDonald v. United States*, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948) (room in a boarding house). And it applies to university students' dormitory rooms. *Houck v. Univ. of Wash.*, 60 Wash.App. 189, 199, 803 P.2d 47 (1991) (applying Wash. Const. art. I, § 7); *Piazzola v. Watkins*, 442 F.2d 284, 289 (5th Cir.1971) ("a student who occupies a college dormitory room enjoys the protection of the Fourth Amendment"); *see also Anobile v. Pelligrino*, 303 F.3d 107, 120-21 (2d Cir.2001) (administrative search for drugs in horse race employees' dormitories located on the racetrack was unconstitutional).

*State v. Houvener,* 145 Wash. App. 408, 416, 186 P.3d 370, 373 (2008)*.*

A long established exception to both the requirements of a warrant and probable cause is a search conducted pursuant to consent. *See  Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043-44, 36 L.Ed.2d 854 (1973)). Entering university students may "contract this investigatory right to the university."  *Grubbs v. State*, 177 S.W.3d 313, 319 (Tex. App. 2005).  By consenting to a university handbook an individual may "waive[] any Fourth Amendment objections to the university's reasonable exercise of that right." *Id., citing  Hunter*, *supra* at 1037 (concluding that by signing residence hall contract

prohibiting the possession or consumption of alcohol and reserving the right to enter and inspect in order to enforce the regulations at any time "to protect and maintain the property of the University, the health and safety of its students, or whenever necessary to aid in the basic responsibility of the University regarding discipline and maintenance of an educational atmosphere," the student waived any Fourth Amendment objections to university's exercise of that right).

A recent case on the issue of consent is that of *Medlock v. Trustees of Indiana University*, 738 F.3d 867 (7th Cir. 2013). The *Medlock* court, speaking through Judge Richard A. Posner stated:

> This is an eye-opening case, but not because of any legal profundities or political reverberations – rather because of the glimpse it affords into contemporary student and administrative cultures of American universities.

> Zachary Medlock was in the spring of 2011 a sophomore at Indiana University's main campus, in Bloomington, living by choice in a university dormitory. As a condition of being allowed to live there he was required to agree to comply with a long list of rules, one of which was that he allow health and safety inspections of his dorm room by "resident leadership specialists" (we'll call them "student inspectors"). They are graduate students employed part-time by the university to assist in dormitory management. Their duties include conducting the inspections. The students whose rooms are to be inspected must be given written notification of the inspection at least 24 hours in advance; Medlock had been given a week's notice by email and in addition the inspection of the dorm rooms on his floor was announced over the building's intercom on the day of the inspection...

[O]ne of the student inspectors entered Medlock's room (Medlock wasn't there) to inspect it, and upon entering noticed a clear plastic tube lying on the desk. Drawing on the training the university had given him to enable him to conduct a competent inspection, he surmised that the tube contained marijuana...

One of the student inspectors called the Indiana University Police Department to report what they thought they'd discovered in Medlock's room. Like other large universities Indiana University has its own police department. It's a real police department—its police officers (of whom there are more than 40 on the Bloomington campus) have the same powers as police officers employed by cities and towns.

An Indiana University police officer (defendant Christopher King), summoned by one of the two student inspectors, arrived in Medlock's room, looked at the tube of marijuana, smelled raw marijuana, and left with the tube. The student inspectors remained, continuing their inspection and noticing burned candles, an ashtray containing ashes, and a rolled-up blanket at the bottom of the door to the bathroom, presumably intended to keep smoke from wafting into the bathroom (which Medlock shared with another student) while he smoked marijuana in his bedroom. Smoking of any kind is forbidden in the dormitory, as is possessing "open flame materials," such as candles.

One of the student inspectors noticed that the door to Medlock's closet was ajar, and peering through the opening he saw what he thought was a large marijuana plant. He summoned officer King, who looked in the closet and found himself face to face with a six-foot-high marijuana plant. He left to get a warrant to search the room for drugs and drug paraphernalia but posted another police officer in the room to make sure

no one moved or destroyed anything that might be contraband.

The warrant was issued and the further search that King conducted pursuant to it revealed both paraphernalia commonly used in relation to marijuana—four conventional pipes, two bongs (water pipes), and a fluorescent light (called a "grow light") for enabling a large marijuana plant to thrive in a closet—plus a total of 89 grams of marijuana (not including the plant itself, doubtless the source of the 89 grams). Not that the plant was thriving, despite its height; a closet is not the optimal environment for a tall plant.

Medlock was arrested and charged with possession of more than 30 grams of marijuana, a felony (he could also have been charged with manufacturing marijuana, also a felony). ..

*****

Medlock claims that the student inspectors plus King violated his Fourth Amendment right to be free from an unreasonable search....

*****

[T]here was no [Fourth Amendment] violation. Medlock had consented in advance, as a condition of being allowed to live in the dormitory, to have his room searched for contraband and other evidence of violation of the health and safety code. He could have lived off campus and thus have avoided being governed by the code. He chose to trade some privacy for a dorm room. His expulsion amounted to holding him to his contract.

Even without explicit consent, and even if the student inspectors had been public officers, their search of Medlock's dorm room would have been a lawful regulatory search. Indiana University's student-housing code is the equivalent of a local housing code, and "it is difficult to enforce such a code without occasional inspections" and "impossible to rely on a system of inspections to enforce the code without making them compulsory, since violators will refuse to consent to being inspected. In these circumstances the Fourth Amendment's requirement that all search warrants be supported by 'probable cause' can be satisfied by demonstrating the reasonableness of the regulatory package that includes compulsory inspections." *Platteville Area Apartment Association v. City of Platteville*, 179 F.3d 574, 578 (7th Cir.1999); *see, e.g., Camara v. Municipal Court*, 387 U.S. 523, 536–38, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). Those cases involved warrants, but warrants are not required when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). Special needs are found in the school setting, *Board of Education of Independent School District No. 92 v. Earls*, 536 U.S. 822, 828–30, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002); *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 652–53, 664–65, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), a setting in which requiring a search warrant "would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed." *New Jersey v. T.L.O.*, 469 U.S. 325, 340, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985); *cf. Osteen v. Henley, supra*, 13 F.3d at 225–26.

The search that officer King conducted before he obtained a warrant stands on a somewhat different footing. He was not a student inspector whom Medlock by deciding to live in the dorm had authorized to search his room. The A to Z Guide—the university's student-housing handbook—states that "authorized university personnel performing safety inspections may enter a room or apartment to ensure that health, fire, and safety regulations are being maintained" but that "no provision in the housing contract gives residence hall officials the authority to consent to a search of a resident's room or apartment by police or other

government officials" and "any law enforcement agency having jurisdiction may, in performing its statutory duties, conduct a search [only] in accordance with legally defined procedures governing search and seizure."

But King's entry and search were superfluous events so far as harm to Medlock was concerned. The student inspectors had already searched the room and found marijuana and other contraband. The closet door was open (Medlock does not deny this) and so the plant was in plain view—not all of it, but enough to make its character unmistakable. What King saw the student inspectors had seen. The intrusion on Medlock's privacy was complete before King entered. And if this is wrong and a third person's glimpse of the incriminating scene could be thought an incremental intrusion, liability would be blocked by the venerable principle of *de minimis non curat lex*, which has been held applicable to a variety of constitutional settings. *E.g., United States v. Jacobsen*, 466 U.S. 109, 120–21, 126, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *Washington v. Hively*, 695 F.3d 641, 643 (7th Cir.2012); *Brandt v. Board of Education*, 480 F.3d 460, 465 (7th Cir.2007); *Hessel v. O'Hearn*, 977 F.2d 299, 302–04 (7th Cir.1992); *Artes–Roy v. City of Aspen*, 31 F.3d 958, 962–63 (10th Cir.1994) (a case factually rather similar to the present one).

Moreover, reasonableness is the touchstone of the Fourth Amendment, *Kentucky v. King*, —— U.S. ——, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011); *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006); *Hamilton v. Village of Oak Lawn*, 735 F.3d 967, 971 (7th Cir.2013), and officer King was acting reasonably in backing up the student inspectors. They had entered Medlock's dorm room lawfully and a plain-view search had revealed marijuana. What were they to do? Remove the suspected marijuana from the room? But they are just students, and the university administration may not want its student inspectors to be seen in the hallways of the dorm carrying quantities of illegal drugs (especially a six-foot-tall marijuana plant) and drug paraphernalia, and may want their suspicions of possible criminal

activity confirmed or dispelled forthwith by a police officer. It thus was sensible of the students to summon a university police officer to confirm their suspicion that they had found marijuana and other contraband and to remove the stuff.

There is no suggestion of pretext or bad faith on the part of any of the defendants. Officer King did not set out to take advantage of a pre-existing student inspection, and the students did not enter Medlock's dorm room for law enforcement purposes. By the time King became aware of the inspection and entered the room, the student inspectors had searched it—lawfully.

In short, the case is near frivolous, the decision to sue the two student inspectors offensive, and the most surprising feature of the entire episode is the exceptional lenity with which a state university (in a state that does not allow medicinal, let alone recreational, use of marijuana) treated a brazen violator of its rules of conduct and of the criminal law. But as we noted some years ago, "the danger that without the procedural safeguards deemed appropriate in civil and criminal litigation public universities will engage in an orgy of expulsions is slight. The relation of students to universities is, after all, essentially that of customer to seller." *Osteen v. Henley, supra*, 13 F.3d at 226. And if we may judge from the happy ending of the marijuana bust for Medlock, the customer is indeed always right.

*Medlock v. Trustees of Indiana Univ.*, 738 F.3d 867, 869-74 (7th Cir. 2013) (Posner, J.).

Here, like *Medlock*, Plaintiffs consented in advance to governance by the

Bucknell handbook[4] as a condition for living in Bucknell housing.[5]   The

handbook provides that rooms may be searched subject to certain conditions.

Plaintiffs did, by intentionally choosing to live in University housing, agree to

governance by the handbook.

Defendants, however, also need to be held to their agreement.  Based on the

facts alleged in the complaint, it appears the Bucknell and County Defendants did

not comply with the entirety of the handbook.  This is the point in which the facts

alleged in the instant matter diverge from those of *Medlock*.   In *Medlock*, the

university complied with the terms of their handbook.  Consequently, that court

---

[4]The Court rejects counsel's argument that the handbook amounts to a
contract of adhesion.  "Typical contracts of adhesion are standard-form contracts
offered by large, economically powerful corporations to unrepresented,
uneducated, and needy individuals on a take-it-or-leave-it basis, with no
opportunity to change the contract's terms." *Klos v. Lotnicze*, 133 F.3d 164, 168
(2d Cir. 1997).  Attending a university and agreeing to a reasonable code of
conduct as outlined by its handbook is not what the doctrine of adhesion contracts
had contemplated.

[5]Although Plaintiff's refer to the fraternity house as "private housing, " and
courts should take the facts alleged in the complaint as true, it appears they are not
using the word "private" to refer to "ownership," but are using the word "private"
to mean only the fraternity members, and no one else,  resided in the home.
    The Court notes that it is impossible to find,  based on the allegation in the
complaint that Bucknell was able to lock the residents out of the residence using
the C-CURE Access Control System, that it was a private residence not controlled
by Bucknell. Bucknell must have maintained ownership and control over the
residence in order to be able to use any sort of system that could lock the residents
out of the building.

dismissed the action.  The facts alleged in the underlying complaint indicate that Defendants did not comply with the terms of the handbook.

First, although it may be disputed as to whether or not the Sheriff's Officers are "police" within the contemplation of the Bucknell handbook, the handbook does not permit their entry either way.  If they are deemed to be police officers, the handbook prohibits entry "by police without the occupant's permission or a legal search warrant."  Accordingly, if the Sheriff's Officer defendants are "police" as contemplated by the handbook, a warrant was required.  On the other hand, if the Sheriff's Officers are not "police," as the County Defendant's contend, for the purposes of the motion to dismiss, then the handbook is silent, at best, as to the permissibility of entry by Sheriff's Officers.   It is not immediately clear from the handbook if Plaintiffs consented to entry by the Sheriff's Officers.   It certainly does not explicitly condone entry by the Sheriff's Office.  Accordingly, either way, there is no clear consent by plaintiffs as to the County Defendants entry into their residence for the undersigned to dismiss the second amended complaint against them at this juncture.

Second, the second amended complaint alleges that the occupants were locked out of their fraternity house for three hours, some in various states of undress, in the middle of winter, because the Defendants pulled the fire alarm to

evacuate the building to conduct the search and prohibited the residents reentry.

The Bucknell handbook states:

> A private room may be opened by an RA or member of the University staff if there is reasonable cause to suspect violation of the law or Student Code of Conduct is occurring.

> The University reserves the right to enter your room in an emergency or if there is reasonable cause to conclude that violation of University policy, or state or federal law, is occurring. Public Safety officers may enter your room any time they believe a crime or violation has been, is about to be, or is being committed.  In most circumstances the officer will knock and announce that "Bucknell Public Safety is requesting entry."  However, exigent circumstance dictate both internally and externally that an officer can key into your room without waiting to be granted access.

It is premature find that Defendants complied with the handbook as to this portion of the allegations.  The second amended complaint does not allege a scenario with exigent circumstance.

Third, the second amended complaint does not allege facts that involve a crime having been committed in front of a public safety officer.  Therefore it is not clear if the first sentence of the plain sight provision modifies the remainder of the paragraph or if it exists independently of the first sentence.  Regardless, the second amended complaint alleges that the search involved areas past those in plain sight.

25

A search following a crime committed in a room in plain sight of an officer can only involve the areas of plain sight.  Public Safety officers may not search any closed areas (such as drawers, closets or bags) without permission of the student, permission from the Dean of Students, and/or a search warrant.

Fourth, a second plain sight provision leads the Court to deny dismissal for the same reason as the exigent circumstances provision.  The second amended complaint does not allege that this situation was emergent.

In the event of an emergency, or if there is reasonable cause to believe that a violation of University policy or state or federal law is occurring or has occurred or exigent circumstances exist, Bucknell reserves the right, exercised through Department of Public Safety officers or other duly authorized University officials, to enter any University-owned or University-supervised residence unit, room or area to conduct a "plain view search" of the room or space, including the refrigerator, or to take appropriate action in response to an emergency whether or not the occupant(s) is present.  A full search of a residence unit, room or area may be authorized by the Dean of Students or his/her designee when there is a reason to believe that there is contraband or ongoing illegal activity or a violation of University regulations, policy or procedures in that unit, room or area, or there exists a danger to the building or the safety of its occupants.

This Court concludes that Defendants could have conducted the search in a manner that was consistent with the Bucknell handbook and avoided litigation.  The second amended complaint alleges a certain overzealousness that resulted in a noncompliance with the handbook.  For all of the reasons addressed above, the motion to dismiss will be denied as to this point.

*B. Qualified immunity/good faith defense*

Our Supreme Court in *Saucier v. Katz* mandated a two-step analysis concerning qualified immunity: first, taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right; and second, whether that right was clearly established. 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 202. The Supreme Court held, however, that *Saucier's* "rigid order of battle" is not a mandatory requirement. *Pearson v. Callahan*, 555 U.S. 223, 235, 129 S.Ct. 808, 172 Ed. 2d 565 (2009). Lower courts can use their discretion to decide which of the two prongs to consider first. *Id.* at 818. The right to be secure in one's own home against unreasonable searches and seizures is a clearly established right. *Payton v. New York*, 445 U.S. 573, 586 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980).

In the matter at hand, all Defendants argue that they are entitled to qualified immunity because the Plaintiffs consented to the search via the handbook. Additionally, the Bucknell Defendants argue that they are entitled to qualified immunity because they relied on the advice of counsel.

As to the second prong of *Saucier*, this is a matter of law for the Court's

determination.  Every reasonable official understands that the clearly established law is that law enforcement needs a warrant or a valid exception to the warrant requirement (combined with probable cause) in order to seize property.  The right to be secure in one's own home against unreasonable searches and seizures is a clearly established right.  *Payton v. New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980).  "Unreasonable searches or seizures conducted without any warrant at all are condemned by the plain language of the first clause of the *[Fourth] Amendment*." *Id.*  at 585.  "It  is a "basic principle of *Fourth Amendment* law" that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586. (Internal citations omitted).   Accordingly, the Court cannot hold as a matter of law at this juncture that the Defendants were entitled to qualified immunity.

The first prong of *Saucier* asking the facts alleged show the officer's conduct violated a constitutional right, is, as the words "facts alleged" indicates, a fact question that cannot be decided by the Court.  First, consent is an issue for the jury.  "Whether consent is voluntary under all the circumstances is a question of fact....[that] must go to the factfinder." *We Buy, Inc. v. Town of Clarkstown*, 2006 U.S. Dist. LEXIS 76792, *9 (S.D. N.Y. Oct. 20 2006) (Sand, J.) *citing Schneckloth, supra.*  Consent must be "freely and voluntarily given. " *Id. citing*

*Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S. Ct. 1788, 20 L. Ed. 2d 797

(1968).  For the same fact question reasons, the issue of whether the Bucknell

Defendants relied in good faith on counsel's advice also remains a question for the

jury.

The Court concludes that it would be premature to dismiss Plaintiff's

*Fourth Amendment* claims for all of the foregoing reasons.  Accordingly, both the

Bucknell Defendants and the County Defendants motions to dismiss are denied as

to Count I.

*2.  Count II: Plaintiffs v. Bucknell Defendants*
*Violation of the First Amendment to the Federal Constitution asserted pursuant to*
*42 U.S.C. § 1983*

Count II alleges First Amendment retaliation claim against the Bucknell

Defendants only based on a letter sent by the Bucknell Defendants.  The letter at

issue is found attached to the second amended complaint as Exhibit 2.  *See* ECF

No. 36-2.  The letter states:

> September 3, 2013
> Re: Notice to Preserve Documents and Electronic Data
> Dear
>
> Bucknell University has recently received a demand letter
> threatening litigation from an attorney representing unidentified
> individuals (current or former Bucknell students) who resided at 23 and
> 64 University Avenue, Lewisburg, Pennsylvania, during the 2011/12

29

academic year.  The latter address is the Kappa Sigma Alpha-Phi Chapter fraternity house.  Both properties are owned by Bucknell University.  The demand letter alleges that the University's search of both residence on February 16, 2012, resulting in confiscation of drug paraphernalia, was improper.  The University will vigorously defend against these claims.

In light of the threatened litigation, we are requesting that you refrain from destroying or altering any documents or electronic data in your possession in any way relating to the February 16, 2012 search of either property.  This request includes all documents or data (1) regarding any student conduct or criminal charges arising prior or subsequent to that date as a result of conduct occurring on those premises; and (2) regarding conduct occurring at those premises from July 1, 2011, to February 16, 2012, constituting a violation of the Pennsylvania Crimes Code or Bucknell University's Code of Conduct. This preservation request includes, but is not limited to, email, social media postings, and text messages.  If litigation is filed, the University will follow up, as necessary, with appropriate subpoenas for the materials.

Thank you for your anticipated cooperation with regard to this request.  Please do not hesitate to contact me at the number above or amy.foerster@bucknell.edu if you have any questions.

Very truly yours,

Amy C. Foerster

General Counsel

cc:   Devon Jacob, Esquire

Neil J. Hamburg, Esquire

The Bucknell Defendants argue that Count II should be dismissed because "Plaintiffs do not and cannot allege that the Bucknell Defendants or its current General Counsel acted under color of state law by sending a routine evidence

preservation letter in response to a threatened lawsuit, nor could a person of ordinary firmness be deterred from pursuing this or any lawsuit, because of such a letter." ECF No. 51 at 20.  In response, Plaintiffs argue that the letter was retaliatory as it was threatening and attempted to paint all of the Plaintiffs in a bad light.  Plaintiffs also argue that the First Amendment claim is based on more than the letter.  Plaintiffs do not explain in their briefs what other alleged factual basis the claim is further premised on, other than the letter.  Accordingly, the Court can only proceed as to what has been alleged – here, that the letter forms the underlying factual basis for this count.

"A retaliation claim under 42 U.S.C. § 1983 must establish that the government responded to the plaintiff's constitutionally protected activity with conduct or speech that would chill or adversely affect his protected activity." *Balt. Sun Co.*, 437 F.3d at 416, *citing Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005);  *ACLU v. Wicomico County*, 999 F.2d 780, 785 (4th Cir. 1993).  "The determination of whether government conduct or speech has a chilling effect or an adverse impact is an objective one -- we determine whether a similarly situated person of "ordinary firmness" reasonably would be chilled by the government conduct in light of the circumstances presented in the particular case." *Balt. Sun Co.*, 437 F.3d at 416,

*citing  Constantine*, 411 F.3d at 500; *Wicomico County*, 999 F.2d at 786; *see also*

*Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999) (tailoring adverse impact

analysis to specific circumstances presented). "Because our analysis of the adverse

impact is objective, it can be resolved as a matter of law." *Balt. Sun Co.*, 437 F.3d

at 416.

"Illustrating the observation that "not every [government] restriction is

sufficient to chill the exercise of First Amendment rights," we have recognized a

distinction between an adverse impact that is actionable, on the one hand, and a *de*

*minimis* inconvenience, on the other." *Balt. Sun Co.*, 437 F.3d at 416.  "Rather, a

§ 1983 retaliation plaintiff must demonstrate that the defendant's actions had some

adverse impact on the exercise of the plaintiff's constitutional rights." *Suarez*

*Corp. Indus.*, 202 F.3d at 685, *See Wicomico County*, 999 F.2d at 785 ("In order to

state a retaliation claim, Appellees are required to show that WCDC's actions

adversely impacted these First Amendment rights.").  "[W]e must measure the

adverse impact against an objectively reasonable plaintiff." *Balt. Sun Co.*, 437

F.3d at 419. "To amount to retaliation, the conduct must be "sufficient to deter a

person of ordinary firmness from exercising his First Amendment rights."" *Mun.*

*Revenue Servs., Inc. v. McBlain*, 347 Fed. Appx. 817, 824 (3d Cir. 2009)

(unpublished) *citing McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006).

"In a proximate vein, the Supreme Court has condoned limiting retaliation liability when the challenged government action, whether conduct or speech, is so pervasive, mundane, and universal in government operations that allowing a plaintiff to proceed on his retaliation claim would "plant the seed of a constitutional case" in "virtually every" interchange." *Balt. Sun Co.*, 437 F.3d at 416, *citing Connick v. Myers*, 461 U.S. 138, 148-49, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983); *see also id.* at 143 (holding that, in the government employment context, public employers can reprimand or punish employees for their speech when that speech does not touch on matters of public concern); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 448-49 (4th Cir. 2004); *cf. Umbehr*, 518 U.S. at 675 (noting that retaliation "may be justified [i.e., unactionable] when legitimate countervailing government interests are sufficiently strong"). "Thus, the *Connick* Court recognized that the retaliation cause of action must be administered to balance governmental and private interests so as not to impose liability in everyday, run-of-the-mill encounters." *Balt. Sun Co.*, 437 F.3d at 416. "[A] public official's malicious intent, taken alone, cannot amount to a retaliatory response." *Id.* at 420.  "The plaintiff in a retaliation case must challenge adverse *conduct or speech." Id. citing Constantine*, 411 F.3d at 500 (repeating that retaliation claims challenge government "conduct").

"Illustrating the second *DiMeglio* (*DiMeglio v. Haines,* 45 F.3d 790 (4th Cir. 1995) observation that not "every restriction [is] actionable, even if retaliatory," we have recognized that some government actions, due to their nature, are not actionable even if they satisfy all the generally articulated elements of a retaliation claim." *Balt. Sun Co.*, 437 at 416-417.  "When the challenged government action is government speech, there is no retaliation liability -- even if the plaintiff can demonstrate a substantial adverse impact -- unless the government speech concerns "private information about an individual" or unless it was "threatening, coercive, or intimidating so as to intimate that punishment, sanction, or adverse regulatory action will imminently follow."" *Id.* at 417, *citing Suarez*, 202 F.3d at 689. "Other courts, likewise, have held that there is no retaliation when the government's alleged retaliatory action was government speech." *Balt. Sun Co.*, 437 F.3d at 417 *citing*, *Benningfield v. City of Houston*, 157 F.3d 369, 376-77 (5th Cir. 1998); *Harrington v. Harris*, 118 F.3d 359, 366 (5th Cir. 1997); *accord Kirby*, 388 F.3d at 450 n. 8. "This limitation on the retaliation cause of action based on government speech is necessary to balance the government's speech interests with the plaintiff's speech interests." *Balt. Sun. Co.*, 437 F.3d at 417, *citing Suarez*, 202 F.3d at 688-89.

"Determining whether a plaintiff's *First Amendment* rights were adversely

34

affected by retaliatory conduct is a fact intensive inquiry that focuses on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." *Suarez Corp. Indus.,* 202 F.3d at 686,  *See Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999)  ("The definition of adverse action is not static across contexts.").

"In general, constitutional retaliation claims are analyzed under a three-part test." *Mun. Revenue Servs., Inc. v. McBlain*, 347 Fed. Appx. 817, 823 (3d Cir. Pa. 2009) (unpublished) *citing Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004). " Plaintiff must prove (1) that [it] engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation." *Id.*

Even if we accept Plaintiff's tenuous assertion that Bucknell Defendants should be considered to be acting under color of state law in sending this letter, to characterize the letter as retaliatory is something of an overreaction.  Nothing in that letter could be read to chill or adversely affect Plaintiffs rights to speech or access to the courts. *See, e.g.,  Balt. Sun Co.*, 437 F.3d at 416.  A  similarly situated person of "ordinary firmness"  would <u>not</u> be chilled by this routine correspondence from Bucknell's general counsel following notification of Plaintiffs intent to sue Bucknell. *See  Balt. Sun Co.*, 437 F.3d at 416.

For all of the foregoing reasons, Count II will be dismissed in its entirety.

### 3.  Count III: Plaintiffs v. Defendants Lantz, Marrara, Badal, Friedberg, Bromfield, Smyer, Bravman, and Ritter
*Violation of the First and/or Fourth Amendments Supervisory Liability asserted pursuant to 42 U.S.C. § 1983*

Preliminarily, to the extent that  Count III is a First Amendment claim, Plaintiffs voluntarily withdrew this claim as to the County Defendants; accordingly Count III will be dismissed as to these defendants.  *See* ECF No. 59 at 5.  Additionally, to the extent that Count III is a First Amendment claim as to the Bucknell Defendants, it is also dismissed as to the Bucknell Defendants, as the Court is dismissing the underlying First Amendment claim in Count II.

Both sets of Defendants argue that they are entitled to qualified immunity as to Count III insofar as it is a Fourth Amendment claim.  For the same reasons set forth in the discussion above as to Count I, it is premature at the motion to dismiss stage for the undersigned to definitively hold that Defendants are entitled to qualified immunity.  The motion to dismiss is therefore denied at this time for further consideration at a later date.

Insofar as Count III is based on the First Amendment, it is dismissed. Insofar as Count III is based on the Fourth Amendment, it survives the instant

36

motions to dismiss.

*4.  Count IV: Plaintiffs v. Defendants Lantz, Marrara, Badal Friedberg, Bromfield, Smyer, Bravman, Ritter, Bucknell, Union County, and Montour County Violation of the First and/or Fourth Amendments - Failure to Train asserted pursuant to 42 U.S.C. § 1983*

Likewise, to the extent that Count IV is a First Amendment claim, Plaintiffs voluntarily withdrew this claim as to the County Defendants; accordingly Count IV as a First Amendment claim will be dismissed as to these defendants.  *See* ECF No. 59 at 5.  Additionally, to the extent that Count IV is a First Amendment claim as to the Bucknell Defendants, it is also dismissed as to the Bucknell Defendants, as the Court is dismissing the underlying First Amendment claim in Count II.

Moving to the Fourth Amendment component of Count IV, however, the County Defendants argue that Plaintiffs did not make a prima facie case as they have not alleged deliberate indifference.  The Bucknell Defendants assert the same premature argument that they are entitled to qualified immunity.

"The United States Supreme Court has recognized that municipal liability may be premised on a municipality's failure to train its employees if the municipality had a policy or custom of failing to train its employees and that the failure to train constitutes "deliberate indifference."  *Schuenemann v. United States,* 2006 WL 408404, *2, 2006 U.S. App. LEXIS 4350 (3d Cir. 2006)

37

(unpublished) (*quoting City of Canton v. Harris*, 489 U.S. 378, 388-389, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) ("Only where a municipality's failure to train its employee in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983.").

"The identified training deficiency must be "closely related" to the ultimate injury, i.e., the plaintiff "must prove that the deficiency in training actually caused the deliberate indifference of municipal officers." *Id.* "Establishing municipal liability on a failure to train claim under § 1983 is difficult." *Kline v. Mansfield*, 255 Fed. Appx. 624, 629 (3d Cir. 2007) (non-precedential) (internal citations omitted). A failure to train claim ordinarily requires a pattern of violations. *See id.* It is possible to maintain a failure to train claim without showing a pattern, but the burden on plaintiff in such a case is high. *See id.*

Chief Judge Christopher C. Conner, of this Court, recently described failure to train as follows,

> Deliberate indifference is a difficult standard for a plaintiff to satisfy in the failure-to-train context. *Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir.1997). It requires that "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d

Cir.1999). The plaintiff must demonstrate that a "policymaker ignored a known or obvious risk," *Grillone v. City of Phila.*, No. 02-CV-6916, 2003 WL 21293801, at *4 (E.D.Pa. Mar.10, 2008) (internal citation omitted), and that the municipality's "deliberate conduct ... was the "moving force" behind the injury alleged. *Reitz*, 125 F.3d at 145 (internal citation omitted). "A need for training or other corrective action to avoid imminent deprivations of a constitutional right must be so apparent that any reasonable policymaker or supervisor would have taken appropriate preventive measures." *Strauss v. Walsh*, No. Civ.A. 01-3625, 2002 WL 32341791, at *3 (E.D.Pa. Dec.17, 2002); *Garcia v. County of Bucks*, 155 F.Supp.2d 259, 268 (E.D.Pa.2001).

*Mills v. City of Harrisburg*, 589 F. Supp. 2d 544, 556 (M.D. Pa. 2008) *aff'd*, 350 F. App'x 770 (3d Cir. 2009).

In light of the state of the law in this regard, the Plaintiffs are unpersuasive; they make sweeping, conclusory statements without factual support for this claim. For example, Plaintiffs assert that "for decades the Defendants knowingly permitted their employees and/or law enforcement officers in their employ to engage in conduct similar..." Second Amended Complaint, ECF No. 36 at 42 ¶ 163. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Plaintiffs must do more than recite the elements of a cause of action, and then make a blanket assertion of an entitlement to relief under it. *Hellmann*, *supra.* Consequently, because the pleadings are insufficient as to the Failure to Train claim, the motions to dismiss will be granted as to Count IV.

*5.  Count V: Plaintiffs v. Defendants Lantz, Marrara, Badal, Friedberg, Bromfield, Smyer, Bravman, Ritter, Bucknell, Union County, and Montour County Violation of the First and/or Fourth Amendment - Municipal Liability asserted pursuant to 42 U.S.C. § 1983*

Again, preliminarily, to the extent that Count V is a First Amendment claim, Plaintiffs voluntarily withdrew this claim as to the County Defendants; accordingly Count V will be dismissed as to these defendants.  *See* ECF No. 59 at 5.  Additionally, to the extent that as Count V is a First Amendment claim as to the Bucknell Defendants, it is also dismissed as to the Bucknell Defendants, as the Court is dismissing the underlying First Amendment claim in Count II.

As to municipal liability premised on the Fourth Amendment violation, the County Defendants argued that there was no policy, practice or custom alleged. The Bucknell Defendants argued first that Bucknell is not a municipality, therefore the count should be dismissed as to them, as well.  Then, after receipt of Plaintiffs opposing brief in which Plaintiffs point out that merely two years ago, in this federal district, the Court held that a *Monell* claim could be brought against Bucknell and its policymakers, the Bucknell Defendants modified their argument to echo that of  the County Defendants.  *See, Dempsey, infra*.

*Monell v. Dep't of Soc. Servs.*, held that a municipality could be sued if an official government policy or custom caused a constitutional violation.  436 U.S.

658, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978).  As this Court has previous stated as

to Bucknell defendants generally,

> To the extent that Plaintiffs attempt to assert liability against Defendant Bucknell for the acts of its employees, *Monell* provides that a municipality is not vicariously liable for the actions of its employees, unless the alleged violations are the result of an official governmental policy or custom. *Monell*, 436 U.S. at 694. *Monell* applies not only to municipalities, but also extends to private organizations faced with Section 1983 liability for actions under color of state law. *Kauffman v. Pa. Soc'y for the Prevention of Cruelty to Animals*, 766 F.Supp.2d 555, 561-62 (E.D.Pa.2011); *see also Regan v. Upper Darby Twp.*, 363 F. App'x 917, 922 (3d Cir.2010) ("[A] city, municipality, or private entity that is a state actor may not be held vicariously liable under § 1983 for the actions of its agents because there is no respondeat superior theory of municipal liability.") (emphasis added) (internal quotation marks omitted); *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583â€"84 (3d Cir.2003). While *Monell* bars Section 1983 actions based on a theory of respondeat superior, liability may be imposed on a municipality or an organization acting under color of state law where constitutional injury results from the decisions of an official with final policymaking authority. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.").

*Dempsey v. Bucknell Univ.*, No. 4:11-CV-1679, 2012 WL 1569826, at *10 (M.D.

Pa. May 3, 2012) (Kane, J.).

In their complaint, Plaintiffs have alleged that officials with final decision

making authority ratified the search and seizure of Plaintiffs residence/property.

These allegations contained in Count V are sufficient to survive Defendants

motions to dismiss.

### 6. Count VI: Plaintiffs v. Individual Defendants
*Violation of Article I, § 8 of the Pennsylvania Constitution Seeking Declaratory and Equitable Relief Only*

Count VI of the Second Amended Complaint, asserts that the Plaintiffs

rights under the Pennsylvania Constitution were violated by the individual

defendants and requests declaratory and equitable relief along with attorney's fees

and costs.   ECF NO. 36 at 45-46.   As an initial matter, Plaintiffs concurred with

the County Defendants by agreeing that Count VI should be dismissed as to the

County Defendants.  ECF No. 59 at 18.  Accordingly, Count VI will be dismissed

as to the individual County Defendants.

The individual Bucknell defendants contend that Count VI should be

dismissed as moot as none of the Plaintiffs currently reside in Bucknell owned

housing as they have all graduated from the university.  ECF No. 51 at 26.

Additionally, the Bucknell defendants assert that Plaintiffs are precluded from

recovering attorney's fees and costs from a claim arising under Article I, Section 8

of the Pennsylvania Constitution. *Id.*  In response, Plaintiffs argued that "the

Bucknell Defendants continue to use the terms of the Student Handbook to

continue to harm the Plaintiffs by refusing to expunge the relevant disciplinary records."  ECF No. 58 at 20.

"Pennsylvania law does not include a statutory equivalent to 42 U.S.C. § 1983, which provides a cause of action for damages because of a federal constitutional violation." *O'Hara v. Hanley*, 2009 WL 2043490, at *9 (W.D. Pa. July 8, 2009) (Fischer, J.).  "The prevailing view is that Pennsylvania does not recognize a private right of action for damages in a suit alleging violation of the Pennsylvania Constitution."  *Gary v. Braddock Cemetery,* 517 F.3d 195, 207 (3d Cir. 2008) *citing Farrell v. County of Montgomery,* 2006 WL 166519 at * 1 (E.D.Pa. Jan. 18, 2006) (Baylson, J.).  "Although there is some support for an action seeking injunctive relief to enforce the equal rights provisions of the Pennsylvania Constitution, there has been no such holding as to an action for damages." *Farrell*, 2006 WL 166519, at *3 (internal citation omitted).

It is clear that the Commonwealth does not allow plaintiffs to pursue a damages claim for violations of its constitution.  Both sets of  Defendants cited to a case that referenced specifically that attorney's fees and costs are also not available for a violation of the Pennsylvania Constitution. *See Sherwood v. Beard*, No. 2012 WL 3679559, at *13 (W.D. Pa. July 27, 2012) (Kelly, M.J.) (stating "Plaintiff seeks monetary damages: nominal damages and compensatory damages

in the amount of $350,000 and punitive damages in the amount of $350,000 against each Defendant, both jointly and severally, including all costs of litigation, attorney fees, delay damages and interest. Under Pennsylvania law, he cannot pursue these claims for monetary damages arising out of alleged violations of the Pennsylvania constitution.") ( report and recommendation adopted, 2012 WL 3686755 (W.D. Pa. Aug. 24, 2012), vacated on other grounds (Oct. 19, 2012) and report and recommendation adopted as modified, 2013 WL 1687834 (W.D. Pa. Apr. 18, 2013) (Cercone, J.).

Plaintiffs cited to no authority for the proposition that attorney's fees and costs are permitted as part of a declaratory and equitable relief claim pursuant to the Pennsylvania Constitution.  Accordingly, this Court follows the lead of Judge David Cercone in the Western District, and the guidance of Judge Michael M. Baylson in the Eastern District, and will not permit attorney's fees and costs here as "the undersigned does not believe district court judges should create a private right of action until and unless a legislative body has clearly allowed it, or an appellate court has issued a holding to that effect." *Farrell*, 2006 WL 166519, at *3.

Finally, plaintiffs' demand for declaratory and equitable relief against the individual Bucknell defendants fails as a matter of law.  Article I § 8 of the

44

Pennsylvania Constitution states "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant."  Plaintiffs assertion that Count VI was brought in order to have their Bucknell student records expunged simply makes no sense.  There is no injunctive, declaratory or equitable relief the undersigned could possible order or direct  Bucknell to do or not do that would secure these particular plaintiffs rights under this particular article and section of the Pennsylvania constitution.  Directing Bucknell to expunge plaintiffs files does nothing to secure these plaintiffs from unreasonable searches and seizures.  The Court concludes that Count VI is moot as a matter of law.  "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Soliman v. U.S. ex rel. INS,* 296 F.3d 1237, 1242 (11th Cir. 2002) *citing  Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969).

Accordingly, Count VI will be dismissed in its entirety.

### 7. Count VII: Plaintiff's v. Bucknell Defendants
### Breach of Contract

The Bucknell Defendants argue that Plaintiffs did not allege a breach of any provision of the University's handbook.  In response, Plaintiffs point to the specific provisions of the handbook they claim the Bucknell Defendants have breached.

To prove a claim for breach of contract, Plaintiffs must prove the following elements: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resulting damages. *See Lackner v. Glosser*, 892 A.3d 21, 30 (Pa. Super. Ct. 2006).  Pennsylvania law has clarified that "the relationship between a private educational institution and an enrolled student is contractual in nature; therefore, a student can bring a cause of action against said institution for breach of contract where the institution ignores or violates portions of the written contract." *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999).  This contract is embodied by the written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of their enrollment in the institution, including the student handbook. *See id.*

The Court agrees with Plaintiffs, for the same reasons set forth above in the

46

search and seizure portion of this memorandum opinion, that Plaintiffs have plead

sufficient facts and specified provisions of the handbook that are alleged to be a

breach of contract claim against the Bucknell Defendants. Accordingly, Count VII

survives the motion to dismiss.

### 8.  Count VIII: Plaintiffs v. Defendant Bucknell University
### Vicarious Liability

The Bucknell Defendants argue, in a mere two sentences, that Plaintiffs

have not sufficiently pleaded an underlying cause of action, therefore no vicarious

liability claim exists.  The Court disagrees.

"An employer is vicariously liable for the wrongful acts of an employee if

that act was committed during the course of and within the scope of employment."

*Phillips v. Lock,* 86 A.3d 906, 913 (Pa. Super. Ct. 2014).  Plaintiffs have

sufficiently plead this claim; accordingly, Count VIII survives the motion to

dismiss.

### 9.  Count IX: Plaintiffs v. Defendants (Excluding Defendants Union and Montour
### Counties)
### Civil Conspiracy

Both sets of Defendants argue that there are no allegations of malice, and

therefore, this claim cannot survive post *Twombly and Iqbal, supra*. The Bucknell

Defendants also argue that there is no underlying unlawful act, an issue that has

been rejected in this memorandum opinion, at least at this stage of the game.

"In Pennsylvania, "to state a cause of action for civil conspiracy, the following elements are required: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage."" *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003), *citing Strickland v. Univ. of Scranton*, 700 A.2d 979, 987-8 (1997) (citation and internal quotations marks omitted) (*cited in Allegheny General Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 446 (3d Cir.2000)).   Additionally, the Pennsylvania Supreme Court stated that there must have been malicious intent.

> To prove a civil conspiracy, it must be shown that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means. *See Landau v. Western Pennsylvania National Bank*, 445 Pa. 217, 282 A.2d 335 (1971); *Fife v. Great Atlantic and Pacific Tea Co.*, 356 Pa. 265, 52 A.2d 24 (1947); Bausbach v. Reiff, 244 Pa. 559, 91 A. 224 (1914); *Baker v. Rangos*, 229 Pa.Super. 333, 324 A.2d 498 (1974). Proof of malice, i. e., an intent to injure, is essential in proof of a conspiracy. *Miller v. Post Publishing Co.*, 266 Pa. 533, 110 A. 265 (1920); *Miller v. Harvey*, 215 Pa. 103, 64 A.2d 330 (1906); *Irvine v. Elliott*, 206 Pa. 152, 55 A.2d 859 (1903). This unlawful intent must be absent justification. The test was stated in *Rosenblum v. Rosenblum*, 320 Pa. 103, 108-09, 181 A. 583, 585 (1935):

> Assume that what is done is intentional, and that it is

> calculated to do harm to others. Then comes the question, Was it done with or without "just cause or excuse"? If it was bona fide done in the use of a man's own property such legal justification would exist not the less because what was done might seem to others to be selfish or unreasonable. But such legal justification would not exist when the act was merely done with the intention of causing temporal harm, without reference to one's own lawful gain, or the lawful enjoyment of one's own rights.

*Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 211, 412 A.2d 466, 472 (1979)

Plaintiffs' complaint, together with the arguments advanced in their papers, are legally insufficient. Plaintiffs recited no alleged factual support for this claim; the complaint merely states the elements of civil conspiracy. The briefs set forth nothing further. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Plaintiffs must do more than recite the elements of a cause of action, and then make a blanket assertion of an entitlement to relief under it. *Hellmann*, *supra.*

Accordingly, because Plaintiffs merely recited the elements of civil conspiracy under Pennsylvania law, with no support for their allegations, Count IX will be dismissed.

*10. Motion to Strike the Introduction Section of the Second Amended Complaint*

As part of their Motion to Dismiss, the county defendants included a Motion

to Strike the Introduction to the Second Amended Complaint.  The request to strike the introduction will be granted.

Rule 8 of the Federal Rules of Civil Procedure limits plaintiffs to a "short and plain statement of the claim."  Additionally, "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:(1) on its own; or (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading." Fed. R. Civ. P. 12.

Fed.R.Civ.P. 12(f). "Immaterial" matter is that which has no essential or important relationship to the claim for relief. *Del. Health Care Inc. V. MCD Holding Co.*, 893 F.Supp. 1279 (D.Del.1995). "Impertinent" matter consists of statements that do not pertain, and are not necessary, to the issues in question. *Cech v. Crescent Hills Coal Co.*, 2002 WL 31002883, No. 96–2185, at *28 (W.D.Pa.2002). A "scandalous" matter or pleading is one that casts a derogatory light on someone, uses repulsive language, or detracts from the dignity of the court. *Carone v. Whalen*, 121 F.R.D. 231, 232 (M.D.Pa.1988).

Plaintiffs introduction, which will be struck, reads as follows:

This case is about whether or not Bucknell University, using its own law enforcement personnel, and county law enforcement personnel who

50

were funded by the taxpayers, was authorized by the Fourth Amendment to the U.S. Constitution, to enter locked homes, without any evidence of the homeowner's prior wrongdoing - let alone a warrant, consent, or probable cause and exigent circumstances - to search through the homeowners' personal belongings for evidence of criminal wrongdoing.

Prior to the filling of the instant litigation, Bucknell University's counsel referred to the case as a "stupid threatened case" by "a bunch of spoiled boys[.]" It is important to not that prior to the unlawful search, only a few of the 60 supposed "spoiled boys" were ever suspected by the University of committing any wrongdoing, and that the alleged contraband was only located in a few of the 60 searched homes.

Lest we forget that our forefathers proclaimed in the Declaration of Independence, "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among those are Life, Liberty, and the pursuit of Happiness." While there are those who may choose to trivialize and excuse what are perceived to be inconsequential infringements on civil rights, those persons should visit Arlington Cemetery where the bodies of over 14,000 soldiers who fought to secure our freedom and civil rights rest for eternity. Our forefathers and soldiers have fought and died for the rights of all citizens, even "spoiled boys" attending "a semisheltered....private, small, expensive liberal arts college in rural Pennsylvania," to enjoy the right "to be secure in their persons houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const., amend. IV; Memorandum, Doc. 34, at p. 8.

ECF No. 36 p 2-3.

The entirety of the introduction section is argumentative, impertinent and wholly irrelevant.

The Court will also act, *sua sponte*, to strike additional paragraphs from the complaint, pursuant to Fed. R. Civ. P. 12(f)(1) and (2) as follows:

> Essentially the Court impaled the Plaintiffs with a "Morton's Fork": (1) either excuse the Defendants' blatant violation of their Fourth Amendment rights, or (2) prosecute their civil rights claims but waive the confidentiality of their student records guaranteed by the Family Educational Rights and Privacy Act of 1974.

ECF No. 36 p 4 ¶ 8.

> "In denying the Plaintiffs' motion, the Court commented that "Curiously, Plaintiffs' counsel himself appears to have invited media scrutiny of the instant action." However, considering the public has a great interest in maintaining the integrity of their Fourth Amendment rights, and absolutely no interest in learning what the initials of six persons representing 60 unidentified persons stands for, the Court's curiosity is difficult to comprehend.

ECF No. 36 p 4 fn 1.

The criticisms of the Court's prior decision detract from the dignity of the Court and are impertinent.  If plaintiffs' counsel disagrees with the Court's prior decision, the appropriate avenue is to request reconsideration through motions practice, not to parade witless observations in an amended pleading.

Finally, the class allegations are struck from the second amended complaint

as Plaintiffs never filed a motion to certify the class.

## III.  CONCLUSION:

Defendants motions will be granted in part and denied in part.  Count I survives the motions.  Count II is dismissed in its entirety.  Count III is dismissed insofar as it is based on the First Amendment, it survives insofar as it is based on the Fourth Amendment.  Count IV is dismissed in its entirety.  Count V is dismissed insofar as it is based on the First Amendment, it survives insofar as it is based on the Fourth Amendment.  Count VI is dismissed in its entirety.  Count VII survives the motions.  Count VIII survives the motions.  Count IX is dismissed in its entirety.  The motion to strike is granted in its entirety; the Plaintiffs are directed to strike the other portions of the complaint as described above.

Plaintiffs will be directed to file a third amended complaint.  An Order in accordance with this Memorandum will follow.

BY THE COURT:


/s Matthew W. Brann
Matthew W. Brann
United States District Judge